FIRST DIVISION
JULY 12, 2010

No. 1-09-0076

| | | |
|---|---|---|
| DOORNBOS HEATING AND AIR CONDITIONING, INC., an Illinois Corporation, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff and Counterdefendant-Appellee, | ) ) | |
| v. | ) ) | |
| JAMES D. SCHLENKER, M.D., S.C., an Illinois Corporation, KATHLEEN ELIZABETH SCHLENKER, as Trustee of the Kathleen Elizabeth Schlenker Declaration of Trust Dated November 10, 1992, | ) ) ) ) ) | No. 02CH19211 |
| Defendants and Counterplaintiffs-Appellants and Third-Party Plaintiffs | ) ) ) | . |
| (Facilities Design, Ltd., an Illinois Corporation, Don Chagnon, d/b/a Team Company, | ) ) ) | The Honorable Robert J. Quinn, |
| Third-Party Defendants). | ) | Judge Presiding. |

JUSTICE PATTI delivered the opinion of the court:

NATURE OF THE CASE AND ISSUES PRESENTED FOR REVIEW

Following a bench trial, the trial court entered judgment in favor of Doornbos Heating &

Air Conditioning, Inc. (Doornbos), on the mechanic's lien claim that Doornbos filed against

defendants James Schlenker (Schlenker) and Kathleen Elizabeth Schlenker, as trustee of the

Kathleen Elizabeth Schlenker Declaration of Trust Dated November 9, 1992, (Trust) (Schlenker and Trust will collectively be referred to as Owners), as well as on the breach of contract counterclaim filed by the Owners.  The Owners appeal the circuit court's judgment, arguing: (1) Doornbos' claims are barred by section 6 of the Mechanics Lien Act (Act) (770 ILCS 60/1 *et seq.* (West 2006)); (2) Doornbos failed to prove that it substantially performed pursuant to the contract; (3) Doornbos failed to prove its claim for extras by clear and convincing evidence and failed to prove the amount of damages to which it was entitled; (4) the trial court erred in finding in favor of Doornbos on the Owners' breach of contract counterclaim; and (5) the trial court erred in granting Doornbos' motion *in limine* barring the Owners from presenting evidence pertaining to delay damages.   For the reasons contained herein, we affirm the judgment of the circuit court.

STATEMENT OF FACTS

The Trust is the owner in fee simple of the property located at 6311 West 95th Street in Oak Lawn, Illinois, which originally consisted of a one-story medical center (hereinafter the Property).  In 1997, the Trust authorized Schlenker, lessee of the Property, to commence a construction project (Project) to expand the existing medical facility located on the Property. The Project initially called for a one-story addition with a surgery center located in the basement of the facility, but was later expanded to consist of a three-story addition with a surgery center located in the lower level.  Because the Project involved the construction of a surgery center, it was subject to the requirements of the Illinois Department of Public Health (IDPH), which has stringent ventilation and fire protection standards for buildings containing such amenities.  Don Changnon, d/b/a Team Company (Changnon), was hired to be the general contractor of the

Project, and Facilities Design, Ltd. (Facilities), was retained as the Project's architect.

On July 15, 1998, Doornbos submitted a $75,000 budget estimate for the Project's heating, ventilation and air conditioning (HVAC) system. On January 5, 1999, Doornbos submitted a $89,850 revised budget estimate, accounting for the provision of HVAC services for the basement-level surgery center. Finally, on May 15, 2000, Doornbos submitted a final scope-of- work estimate, which encapsulated Doornbos' understanding of the necessary HVAC services required for the expanded scope of the Project. Doornbos' prior scope-of-work estimates were merged into the May 15, 2000, estimate, which formed the basis for the parties' contract. Pursuant to the May 15, 2000, written contract, Doornbos agreed to provide the necessary labor and materials to construct the HVAC system for the Project in exchange for payment of $493,208. In addition to providing labor and materials, the contract called for Doornbos to "design the complete [HVAC] system, provide drawings, submittals and schedules for approval."

Initially, Doornbos provided the HVAC services contemplated by its contract and received timely payment therefor. Ultimately, however, problems developed between the Owners and Doornbos. Accordingly, on September 19, 2002, Doornbos recorded a mechanic's lien claim with the Cook County recorder of deeds and filed a verified complaint to foreclose its lien in the circuit court of Cook County on October 21, 2002. In its complaint, Doornbos alleged that it "furnished all of the materials, services, labor, and equipment required" by the contract as well as additional labor and materials totaling $100,909, bringing the total value of the labor and materials that Doornbos provided to $591,117. Doornbos further alleged that it completed its

work on the Project on July 17, 2002. As of that date, Doornbos had received partial payment pursuant to the contract, but was still owed $53,013.65. Accordingly, Doornbos sought to foreclose its mechanic's lien totaling $53,013.65 and recoup the attorney fees and costs associated with the commencement of bringing its action in the circuit court.

On February 4, 2003, the Owners filed an answer to Doornbos' complaint to foreclose its mechanic's lien. In pertinent part, the Owners admitted that they had not paid the amount demanded by Doornbos but denied the material allegations advanced in Doornbos' complaint to foreclose its lien. Moreover, the Owners asserted a breach of contract counterclaim against Doornbos, contending that Doornbos breached its contract when it:

"(a) Failed to install a collecting system for the condensation from the condensor coils on the roof, causing water to pour down and damage ceiling tiles; (b) Caused the condensing unit to run in reverse, putting additional wear and tear on the unit and interfering with its efficiency; (c) Installed ductwork in violation of existing codes; (d) Installed ducts in the operating room which caused the ceiling to have too little clearance; (e) Multiple VAX boxes to not operate; (f) Fail[ed] to install the shut down alarm system; (g) Fail[ed] to install adequate heating coils in the operating room; (h) Fail[ed] to install an adequate exhaust fan in the operating room; (i) Fail[ed] to install dampers in the verticle ducts; (j) Fail[ed] to install dampers according to manufacturer's specifications; (k) Fail[ed] to provide adequate ventilation in the computer room; [and] (l) Fail[ed] to

4

provide control of air conditioning units."

The Owners further alleged that as a direct and proximate cause of Doornbos' breach of contract, they incurred damages in excess of $500,000.[1]

Thereafter, the parties engaged in discovery and the cause ultimately proceeded before a bench trial. Prior to trial, Doornbos filed a motion *in limine* to bar the Owners from seeking delay damages because they failed to specifically allege that they suffered those damages in their breach of contract counterclaim. The circuit court granted Doornbos' motion and trial commenced on June 4, 2007. Trial testimony revealed the following:

Robert Doornbos, Doornbos' owner, testified that his company was in the business of providing HVAC services. Although he was not a mechanical engineer, Robert had previously designed HVAC systems, explaining that he would produce "concept drawings," which he would turn over to the architect or engineer responsible for overseeing a given construction project. In July 1998, Schlenker requested Doornbos to provide a budget estimate of the costs associated with installing an HVAC system in his medical building. Thereafter, Schlenker requested Robert to provide an estimate for HVAC work for a basement-level surgery center. In making his request, Schlenker advised Robert that the HVAC work would need to be IDPH compliant and that Robert would need to factor in those requirements in designing the basement's HVAC system. Robert indicated that he was not familiar with surgery areas or IDPH codes and that any plan he would design would be based on his prior HVAC experience rather than his familiarity

---

[1] The Owners also filed actions against Facilities and Changnon. These actions proceeded independently and neither Facilities nor Changnon is a party to this appeal.

with specific codes. Because of the IDPH issues, Robert recommended that Schlenker hire a mechanical engineer for the Project.

On January 5, 1999, following this conversation, Doornbos submitted another estimate comprising the HVAC work to be performed in the basement of the Project. In making the estimate, Robert relied on a document, "Table A," that Schlenker provided him regarding the air flow exchanges required for the rooms in the surgery center. He explained, however, that the sizes of the basement level rooms changed during the course of the Project, which ultimately affected the air flow exchange rate requirements, rendering them different from the ones he had used in providing the January 1999 estimate. Robert specifically excluded an engineer's stamp of approval in the January 1999 scope-of-work estimate, and he explained that this exclusion served to reiterate conversations he had with Schlenker and the Project's architect, Albert Kerelis, that he was not a mechanical engineer and could not be responsible for ultimately designing an HVAC system that was compliant with IDPH requirements.

Robert did not recall the date on which Doornbos commenced work on the Project but knew his company was on the construction site in April 1999. By that time, Robert had completed drawings for the surgery center as well as for other parts of the building and had tendered them to Kerelis for review; however, he had not received any formal approval of his drawings. Don Changnon, the general contractor, however, instructed Doornbos to commence work even though the drawings Robert provided had not been approved. Changnon informed Robert that any alterations in the plans would be addressed on an as-needed basis. Doornbos ultimately provided work in addition to that contemplated by the January 1999 scope-of-work

based on the instructions Changnon provided.

During the course of the Project, Robert continued to inquire whether his drawings had been approved by the IDPH, but he never received a copy of any approved plans from Kerelis. He also sought feedback from Kerelis on various issues but did not receive the direction he sought. Robert explained that he sent Kerelis a fax dated January 12, 2000, inquiring about the fire dampers that the Project required. Kerelis, however, failed to provide any drawings or formal direction addressing Robert's questions. Robert voiced his concerns about the Project including the surgery center and his lack of familiarity with IDPH codes to Changnon, but was advised to continue the work. Doornbos submitted its final scope of work on May 15, 2000, which included additional work and merged the work contemplated by the prior estimates it had submitted on the Project.

Various problems arose during the course of the Project, including plumbing, fire rating, and foundational issues. There were also problems that arose related to the HVAC system, including the installation of the fire dampers. Robert indicated that Changnon provided Doornbos employees with directions as to the placement and installation of the fire dampers, but the IDPH determined that they had not been properly installed. Doornbos addressed the concerns of the IDPH and Schlenker agreed to pay Doornbos for the additional time and material it used to remedy those issues. In addition to the fire dampers, problems arose with the ductwork in the surgery center, and the ductwork was subsequently moved at Schlenker's request. The modification affected the air flow in the surgery center, which Doornbos corrected.

In November 2001, two inspectors from the IDPH came out at Schlenker's request to

inspect the Project, the progress of which was fairly advanced. One of the inspectors had a discussion with Robert about issues concerning the HVAC system, specifically the ductwork and fire dampers. Robert talked with Schlenker following the inspection and Schlenker expressed his dissatisfaction with Kerelis' performance, authorized Robert to do the work necessary to bring the HVAC system into compliance with the IDPH requirements, and agreed to compensate Doornbos accordingly.

Throughout the Project, Doornbos initially received timely payments for the labor, materials, and extras it provided; however, in July 2002, there was a balance totaling approximately $53,000 that Doornbos was owed and Robert refused to provide any additional work unless the balance was paid. At no time did Robert receive any indication from Kerelis or Changnon that the work Doornbos provided on the Project was unsatisfactory.

Robert acknowledged that the Project had not yet passed IDPH inspection when Doornbos walked off the Project and that Doornbos did not provide any corrective work on the Project after July 2002. He further acknowledged that he did not conduct any independent research to determine which codes were applicable to the HVAC system Doornbos installed on the Project. Although he believed the Project required the expertise of a mechanical engineer, Robert did not employ one to assist him with drawing up plans for the HVAC system. He explained, however, that pursuant to his understanding with Schlenker and Kerelis, his designs were simply preliminary measures that were subject to the approval of Kerelis. Pursuant to his understanding, it was Kerelis' responsibility, as the Project's architect, to ensure that the HVAC system conformed to the applicable codes. At no time did he receive any documents from

Kerelis officially approving his HVAC design despite that fact that he requested official approvals during the course of the Project.

With respect to Doornbos' mechanics lien, $100,900 included "extras." Robert acknowledged that Doornbos did not receive any change order forms signed by Schlenker authorizing the work it performed. Moreover, he indicated that Doornbos' lien claim contained a calculation error, and the correct lien amount was $50,113.65 rather than the $53,113.65 sum specified in the lien it recorded with the Cook County recorder of deeds.

Albert Kerelis, president of Facilities, the architectural firm hired to oversee the Project, testified that he was initially approached by Schlenker in 1997 regarding the Project, the scope of which changed over time. As the architect of the Project, Kerelis indicated he was responsible for the complete design of the building, including the structural, mechanical, electrical, and plumbing aspects of the building. Although he suggested that Schlenker employ a mechanical engineer, Schlenker indicated it was too expensive. Accordingly, Kerelis prepared record drawings for the Project, which he submitted to the IDPH for approval. It took time to obtain the requisite approval, and in the interim, construction commenced on the Project. In preparing his plans, Kerelis obtained "shop drawings" from Doornbos, who had a "design-build" contract, regarding the HVAC system. Kerelis indicated to Schlenker that he had expected to receive sealed drawings by a mechanical engineer due to the expanded scope of the Project, but Schlenker advised him to proceed. Accordingly, Kerelis reviewed and redrew the design, thereby assuming responsibility for the HVAC system. Much of the physical installation of the HVAC system occurred prior to obtaining IDPH approval, which Kerelis indicated was an unusual

9

practice.

Following the IDPH's inspection in which various design and installation deficiencies were discovered, Schlenker employed another architect to bring the Project into compliance and Kerelis learned he had been terminated as the Project's architect. Kerelis acknowledged that there were issues concerning the placement and installation of the fire dampers on the Project and that he had provided direction as to the installation locations. He acknowledged that he did not have much prior experience working with the IDPH and that the drawings he sent to the IDPH for approval did not contain fire damper locations. In Kerelis' opinion, Doornbos performed its work in a workmanlike manner. At no time during the Project did Schlenker indicate to Kerelis that he was unsatisfied with Doornbos' work.

Gary Powers, a licensed mechanical engineer, testified that he has designed mechanical, electrical, and plumbing systems for commercial and industrial buildings, and indicated that after completing a set of building plans, he would, in his standard practice, seal and assume responsibility for them. Powers opined that when a construction project proceeds without a mechanical engineer, the architect would be responsible for sealing and stamping the plans. Powers indicated that he reviewed the design plans associated with the Project and observed that they were stamped by Albert Kerelis on August 18, 2002. He noted, however, that Kerelis' stamp only appeared on the first page of the plans and indicated that, in most cases, every page in a building plan is usually stamped. Sometime in 2000 or 2001, he was contacted by Robert Doornbos, who requested an estimate for Powers' mechanical engineering expertise on the Project. Powers provided Doornbos with an estimate, but his services were not retained. Powers

testified that because there was no mechanical engineer associated with the Project, it was the responsibility of the architect to design the Project's mechanical system.

James Schlenker testified on his own behalf and acknowledged that his wife, Kathleen, in trust, owned the Property and that it was leased by his medical practice. In 1997, he decided to expand the Property and Doornbos submitted a bid on the Project. Doornbos submitted several additional estimates as the Project increased in scope. The first proposal, dated July 15, 1998, referenced the Illinois Administrative Code provisions governing construction projects like the one contemplated by Schlenker. In its January 5, 1999, proposal, Doornbos specifically excluded an engineer's stamp of approval. The final proposal, dated May 15, 2000, was submitted at a point where Doornbos had already completed more than half of the HVAC work on the Project, and the provision regarding the exclusion of an engineer's stamp of approval was removed from the agreement. On or about the time Doornbos submitted its final scope of work, Schlenker and Robert conversed and Robert indicated that he had employed a mechanical engineer who would ensure that the work Doornbos provided met applicable code requirements.

Based on Schlenker's understanding of Doornbos' contract, Doornbos was responsible for designing an HVAC system that would meet the approval of the IDPH. Nobody from Doornbos ever indicated that the firm was unfamiliar with state codes or was not qualified to design and install the Project's HVAC system. During the course of the Project, some of the work Doornbos provided was found not to be in compliance with applicable codes. Specifically, there were issues pertaining to the ceiling height, ductwork, and fire dampers. In March 2002, payment disputes arose between Schlenker and Doornbos, and Doornbos eventually stopped

providing work on the Project on July 17, 2002. When Doornbos walked off the jobsite in 2002, the HVAC system had not been completed and it failed to provide him with instructions regarding the system's operation.

Schlenker acknowledged that he did not maintain a daily presence at the jobsite and did not know of the communications between Changnon, his project manager, Kerelis, his architect, and Doornbos personnel. Schlenker opined it was a mistake to proceed with the Project before obtaining the IDPH's approval of the building plans. Although Kerelis provided stamped plans to the IDPH, Schlenker believed it was merely to facilitate IDPH approval and that Doornbos was ultimately responsible for the design and code compliance of the HVAC system. He acknowledged that Changnon signed off on all of the invoices, dated up until July 16, 2002, that Doornbos submitted, but Schlenker believed Changnon was simply certifying that the work for which Doornbos was seeking payment was completed, not that the work complied with code requirements. Accordingly, even though Changnon signed off on Doornbos' invoices, Schlenker indicated he did not believe he had to pay Doornbos until the Project was code-compliant. Despite this belief, in a letter dated July 17, 2002, Schlenker offered to make a partial payment to Doornbos if it agreed to recommence work on the Project.

Lynn Manley, a staff architect with the Illinois Department of Public Health, testified that he corresponded with Kerelis about the Project and its compliance with IDPH codes. Upon his review of the plans Kerelis submitted, Manley observed that they lacked fire damper locations. IDPH officials conducted a courtesy inspection of the Project on November 21, 2001, to evaluate the progress of the Project and its compliance with IDPH codes. In a letter dated November 26,

12

2001, Manley discussed issues with the fire dampers and air filters, which amounted to code violations. The Project, as evaluated by IDPH inspectors in November 2001, would not have passed code inspection. IDPH personnel conducted another inspection of the Project on March 13, 2002, and documented problems that had not been corrected following the initial inspection, as well as new deficiencies, and established a plan of correction for Schlenker to follow to bring the Project into compliance. The IDPH's final inspection of the Project took place on July 2, 2003, and surveyors confirmed that the requisite corrections had been made. Accordingly, in a letter dated July 9, 2003, the IDPH provided Schlenker with a letter formally approving the Project for occupancy. Manley acknowledged that it was fairly unusual for a construction project to require two years to obtain IDPH approval and opined that the reason the process in this case was so lengthy was because the Project's architect and designers lacked health care construction experience. Pursuant to his experience, responsibility for the design of a construction project falls upon the architect when a mechanical engineer is not employed, and Manley did not believe that there was a mechanical engineer associated with Schlenker's Project.

Manley acknowledged that the deficiencies observed during the preliminary IDPH inspections of the HVAC system were not unusual and indicated that it is common to find construction irregularities prior to a final inspection. Moreover, the deficiencies IDPH personnel discovered on the Project did not pertain solely to the HVAC system; rather, HVAC problems only comprised approximately one-third of the total problems discovered.

Joginder Makhija, president of D&M Associates, a mechanical and electrical consulting engineering firm that specializes in preparing mechanical plans on health care construction

13

projects, testified that he was contacted in August 2002 and asked to help the Project conform to IDPH requirements. Makhija reviewed sketches of the mechanical systems and conducted a walk-through of the surgery center. The sketches he reviewed were not the kind he would expect to find for a construction endeavor like the one contemplated by the Project. After conducting his review, Makhija made recommendations as to how to bring the Project into compliance with the IDPH. In particular, he made recommendations to alter the air flow and correct the ductwork. In his opinion, this construction project was one in which a mechanical contractor should have been employed to seal the mechanical drawings and submit them for approval.

Allen Howard, a retired electrical contractor and owner of Union Electric Company, testified that Schlenker employed his company to design and install the electrical system for the Project. Howard had familiarity with design-build contracts, wherein a contractor is responsible for designing a system that is required, based on the facility that is being constructed, and indicated that Union Electric had such a contract on the Project. Accordingly, Howard selected the materials to install and the location installations. As the Project's electrical system design-builder, Howard was ultimately responsible for the system and its compliance with applicable codes and regulations. His company conducted research on the applicable code provisions prior to starting work and prepared a line drawing of the proposed electrical system, which was then delivered to Al Kerelis, the Project's architect. Howard acknowledged that Kerelis compiled the line drawing into a drawing that was submitted for IDPH approval, but indicated that he nonetheless retained ultimate responsibility for the Project's electrical system.

Howard knew Doornbos was the HVAC contractor for the Project and assumed Doornbos

had a similar design-build contract with respect to the Project's HVAC system; however, he did not know who bore responsibility for ensuring that the HVAC system complied with the applicable codes. Howard acknowledged that the electrical system was impacted when problems were discovered with the HVAC system, specifically changes to the electrical system had to be made as a result of remedies undertaken with respect to the ductwork, air exchange rates, and fire dampers. Although he knew electrical equipment had to be moved when fire damper locations were altered, Howard had no knowledge as to the person responsible for the initial fire damper locations. He also acknowledged that he had little communication with Kerelis, who was only present at the Project site once a month.

Ken Rutkiewicz, owner of Red Cabbage Consulting, a business that provides electronic and computer services for small businesses, testified that Schlenker retained his services on the Project to install the computer network and data systems for the building. In addition, sometime in 2001 or 2002, Schlenker approached him to assist with the computerized HVAC control system, even though, pursuant to his understanding, the system was the responsibility of Doornbos. Doornbos personnel had failed to explain to Schlenker how to run the computerized HVAC system. Schlenker requested Doornbos to provide Rutkiewicz with the tools, software, and manuals necessary to understand the system but Rutkiewicz was never provided those materials. In April 2002, the system was not operational and Rutkiewicz was compelled to contact the manufacturer of the system. When Doornbos left the Project in July 2002, Rutkiewicz worked to make the system operational. Various elements throughout the building had not been properly wired to the central processing system. Rutkiewicz acknowledged that he

was not familiar with Doornbos' contractual responsibilities and was thus unaware whether the work he performed fell within the scope of Doornbos' contract.

Dennis King, an HVAC professional, testified that in the fall of 2002, Schlenker obtained the services of his family's company, Around the Clock, to provide HVAC work on the Project. He was aware that Doornbos was the initial HVAC contractor on the Project, but indicated it was no longer working on the Project when Around the Clock arrived at the jobsite. Around the Clock was brought onto the Project because it needed to pass IPDH inspection and there were issues concerning the fire dampers in the surgery center. At the time it commenced work, the system was operational, but Schlenker did not have control of the system. King took his direction from Joginder Makhija regarding the corrective work. There were some missing fire dampers as well as some that had been installed improperly. After Around the Clock finished its work on the Property, the IDPH conducted a final inspection and the Property passed the inspection. King acknowledged that he was not familiar with Doornbos' contractual responsibilities and was thus unaware if the work Around the Clock performed was work that Doornbos was supposed to have completed pursuant to its contract.

Brian Berg, a mechanical engineer specializing in HVAC work, testified as the Owners' retained expert witness. He inspected the Project site in 2004 and reviewed design documents associated with the Project. Based on his review of the plans sealed by Kerelis, the mechanical drawings incorporated therein were not prepared by the architect. In his opinion, Doornbos violated the Illinois engineering licensing requirement by offering to provide engineering services to design the Project's HVAC system without using the services of a licensed engineer.

16

Doornbos was not qualified to certify that the HVAC system was installed in accordance with the applicable codes. Moreover, there were deficiencies in Doornbos' design and installation of the HVAC system.

Berg acknowledged that he did not observe any of the work that Doornbos provided on the Project and that he was unfamiliar with the contractual relationship Schlenker had with Kerelis and Facilities Design. He was never informed that Kerelis sealed the Project's mechanical designs and admitted that an architect who seals plans and assumes responsibility for a construction design is ultimately responsible for that design and for all defects resulting from that design. Berg indicated, however, that a contractor's responsibility to comply with applicable codes is not alleviated merely because an architect assumes responsibility for a design.

After hearing the aforementioned testimony, the circuit court filed a written order entering judgment in favor of Doornbos on its mechanic's lien claim. In its order, filed on December 18, 2008, the court observed:

> "The main dispute between the parties centers around whether the plaintiff
> was responsible, contractually, to design and build the HVAC system in
> conformance with Illinois Department of Public Health (IDPH) codes
> concerning proper compliance. If Doornbos, the HVAC contractor[,] was
> responsible for designing and building the HVAC system in conformance
> with the applicable codes, then Plaintiff would be the party who
> breach[ed] the contract and would be responsible for any costs incurred to
> bring the system to code. If the owners['] design professional or general

17

contractor was responsible for making sure the construction complied with applicable codes, then the HVAC subcontractor would be entitled to recovery for his labor and materials, including extras, for providing an HVAC system conforming [to] the sealed plans provided by the design professional."

In its disposition, the circuit court found that Schlenker's testimony lacked credibility and that Doornbos' version of the facts was more credible. The court then observed that the Act is to be liberally construed and serves a remedial purpose and found that Doornbos had complied with the Act's notice and filing requirements and had met its burden of proof on its mechanic's lien claim. Accordingly, the court entered judgment in favor of Doornbos on its mechanic's lien claim in the amount of $50,013.65 plus interest, which amounted to $25,678.53, and costs. The court also entered judgment in favor of Doornbos on defendants' counterclaim, finding that the Owners failed to prove the material allegations asserted in their breach of contract claim. This appeal followed.

ANALYSIS

On appeal, the Owners first contend that the trial court erred in finding in favor of Doornbos on its mechanic's lien claim because it failed to comply with section 6 of the Act (770 ILCS 60/6 (West 2000)), which requires that work for which a mechanic's lien is sought be completed within three years after the commencement of the work. Although the date of the final contract was May 15, 2000, the Owners observe that pursuant to the testimony of Robert Doornbos, his company commenced work on the Project some time in April 1999. Because

18

1-09-0076

Doornbos left the Project site on July 17, 2002, the Owners argue that the work for which Doornbos asserts a lien was not completed within three years of its commencement and, thus, section 6 of the Act serves to bar its claim.

The Act is a comprehensive statutory enactment that sets forth the rights, remedies, and responsibilities of the parties to construction contracts, including property owners, contractors and subcontractors. Cordeck Sales, Inc. v. Construction Systems, Inc., 382 Ill. App. 3d 334, 353 (2008) (Cordeck Sales I). The purpose of the Act is to permit contractors and subcontractors that furnish labor and materials, thereby increasing the value or condition of a property, to assert a lien upon that property and recover the monetary benefits the party has conferred upon the property's owner. Weather-Tite, Inc. v. University of St. Francis, 233 Ill. 2d 385, 391 (2009); see also Inter-Rail Systems, Inc. v. Ravi Corp., 387 Ill. App. 3d 510, 516 (2008). Because the remedies provided for in the Act are statutory and in derogation of common law, a lien-claimant must strictly comply with the technical requirements of the Act in order to be eligible for relief. Cordeck Sales, I, 382 Ill. 3d at 353; see also Tefco Construction Co. v. Continental Community Bank & Trust Co., 357 Ill. App. 3d 714, 719 (2005) ("While the Act should be construed liberally as a remedial one, being in derogation of common law, it is strictly construed with reference to the requirements upon which the right to a lien depends").

One of the technical requirements with which a lien claimant must comply is section 6 of the Act, which provides:

"In no event shall it be necessary to fix or stipulate in any contract a time for the completion or a time for payment in order to obtain a lien

19

under this act, provided, that the work is done or material furnished within three years from the commencement of said work or the commencement of furnishing said material." 770 ILCS 60/6 (West 2002).

Based on the plain language of section 6, "the 3-year period commences with the beginning of *work for which the mechanic's lien is asserted* and not with the date upon which the contract for such work was entered into." (Emphasis added.) Robb v. Lindquist, 23 Ill. App. 3d 186, 188 (1974); see also Cordeck Sales, Inc. v. Construction Systems, Inc., 394 Ill. App. 3d 870, 877 (2009) (Cordeck Sales II) (recognizing that " 'the work' to be completed in accordance with the time limits of section 6 is the work for which lien enforcement is sought"). Accordingly, if the work for which a lien claimant asserts a lien is completed within three years, section 6 does not preclude foreclosure of its mechanic's lien. See, e.g., Cordeck Sales II, 394 Ill. App. 3d at 877; Robb, 23 Ill. App. 3d at 188-89.

Here, the parties agree that Doornbos submitted its initial scope of work bid on the Project on July 15, 1998, and a revised bid on January 5, 1999, both of which were merged into the final bid it submitted on May 15, 2000. Moreover, there is no dispute that Doornbos commenced work in April 1999 and terminated its work on the Project on July 17, 2002. Accordingly, Doornbos provided HVAC work, pursuant to contract, on the Project for approximately three years and three months. While Doornbos undisputably provided labor and materials over a three-year time span, it initially received regular timely payments for the work it provided. Indeed, over the three-year period, Doornbos provided HVAC labor and materials totaling $591,117; however, it did not assert a lien for all of the work completed over that period.

20

Rather, Doornbos' lien was only for $50,013.65. Moreover, the record reveals that as of February 28, 2000, Doornbos provided HVAC labor and materials totaling $317, 033, and was paid this amount on May 13, 2000. Accordingly, the work for which Doornbos asserted its lien did not commence until after the February 28, 2000, invoice date and terminated within three years on July 17, 2002.

The Owners cite to no relevant controlling authority that the time requirement of section 6 of the Act applies to all the labor and materials furnished pursuant to contract and is triggered by the commencement of any work that is furnished. Instead, as we have observed above, Illinois courts have emphasized that the three-year requirement specified in section 6 applies to the labor and materials provided by the lien contractor *for which the lien is being sought*. Cordeck Sales II., 394 Ill. App. 3d at 877; Robb, 23 Ill. App. 3d at 188-89. Here, Doornbos is not asserting a lien for all the labor and materials it provided during the course of the Project; rather, the materials and labor for which it asserts a lien includes work commenced after February 28, 2000. Because the labor and work for which Doornbos asserts its lien was completed by July 17, 2002, within three years of its commencement, we find that section 6 of the Act does not serve as a bar to its mechanic's lien claim.

The Owners next contest the circuit court's judgment in favor of Doornbos on its mechanic's lien claim, arguing that Doornbos failed to prove that it substantially performed under the contract. The Owners contend that the record shows that the HVAC work Doornbos provided was substantially defective and observe that the Project had not received IDPH approval when Doornbos terminated its work on the Project. Accordingly, the Owners argue that

the circuit court's finding that Doornbos met its burden of proof with respect to its mechanic's lien claim was against the manifest weight of the evidence.

It is the burden of the party seeking to enforce a mechanic's lien to satisfy the elements necessary to establish the lien. Tefco, 357 Ill. App. 3d at 718-19; Fieldcrest Builders, Inc. v. Antonucci, 311 Ill. App. 3d 597, 609 (1999). Specifically, the lien claimant must establish and show that: (1) the lien claimant had a valid contract; (2) with the property owner, the owner's agent, or somebody authorized by the owner to contract for property improvements; (3) to furnish labor services or materials; and (4) the lien claimant performed pursuant to the contract or had a valid excuse for its nonperformance. Tefco, 357 Ill. App. 3d at 719; Fieldcrest, 311 Ill. App. 3d at 609. Although the general rule requires a mechanic's lien claimant to establish full performance of the contract to enforce a lien for the value of the work or services performed, a lien claimant may still enforce a lien by proving substantial performance. Fieldcrest, 311 Ill. App. 3d at 610; Mani Electrical Contractors v. Kioutas, 243 Ill. App. 3d 662, 667-68 (1993). Substantial performance is " 'honest and faithful performance of the contract in its material and substantial parts, with no willful departure from, or omission of, the essential elements of the contract.' " Mani, 243 Ill. App. 3d at 668, quoting Folk v. Central National Bank & Trust Co., 210 Ill. App. 3d 43, 46-47 (1991). Indeed, "[a] building contract may be held to be substantially performed, although there may be some omissions or deviations from the contract, or some defects in the material or workmanship, when these are not due to bad faith, do not impair the structure as a whole, [and] are remediable without doing material damage to other parts of the building." Philip Carey Manufacturing Co. v. Weygandt, 143 Ill. App. 297, 298 (1908). What

22

constitutes substantial performance depends on the circumstances of each case (Mani, 243 Ill. App. 3d at 668), and it is the lien claimaint's burden to establish substantial performance (Fieldcrest, 311 Ill. App. 3d at 610). Whether a lien claimant satisfies its burden is a question of fact, and the trial court's determination as to whether the contractor substantially performed will not be disturbed unless its finding is against the manifest weight of the evidence. Mani, 243 Ill. App. 3d at 668; Evans & Associates, Inc. v. Dyer, 246 Ill. App. 3d 231, 240 (1993). A trial court's factual finding is against the manifest weight of the evidence only when a contrary conclusion is clearly apparent. Mani, 243 Ill. App. 3d at 668.

Here, we do not conclude that the circuit court's finding that Doornbos satisfied its burden of proof regarding its lien claim and established substantial performance was against the manifest weight of the evidence. The record reveals that the Project commenced before Kerelis' building plans were approved by the IDPH. As a result, a number of code violations were discovered during IDPH inspections, some of which pertained to the HVAC work that Doornbos provided. In particular, there were issues concerning the location and installation of the fire dampers and placement of ductwork. There is no evidence, however, that these defects were due to bad faith or were not remediable. Indeed, at trial, Al Kerelis acknowledged that he provided direction as to the fire damper locations. Moreover, although some of the dampers were installed upside down, Kerelis indicated that they would still function because the spring dampers did not depend on gravity. In Kerelis' opinion, Doornbos' only error was the incorrect placement of ductwork in one of the surgery rooms; however, Doornbos relocated the ductwork to the designated location and Robert testified that it did not charge the Owners for the relocation.

23

Indeed, Kerelis opined that Doornbos provided its work in a workmanlike manner and indicated that Schlenker never indicated that he was unsatisfied with Doornbos' HVAC services.

While the Owners categorize the problems with the HVAC work as "substantial," and emphasize that the Project had not received the requisite IDPH approval when Doornbos walked off the construction site, IDPH staff architect Lynn Manley testified that the deficiencies observed with respect to the HVAC system during the IDPH inspections were not unusual; rather, it was common to find such irregularities. Moreover, the Project was plagued with defects and the HVAC problems comprised only one-third of the construction problems found by IDPH inspectors. Accordingly, while there were defects, there is no evidence that the defects were not remediable or that they stemmed from the bad faith of Doornbos. It was the trial court's responsibility to draw conclusions regarding the evidence and witness credibility, and because there is evidence to support a finding that Doornbos substantially performed under the contract, we conclude that the judgment is not against the manifest weight of the evidence. See, e.g., Mani, 243 Ill. App. 3d at 670.

The Owners next dispute the trial court's damage award. First, they contend that Doornbos failed to prove its claim for extras by clear and convincing evidence. The Owners observe that Doornbos' contract price was $493,208 but that it received payment of $541,103.35 by the time it terminated its work on the Project, which was $47,895.35 in excess of the contract price, and recorded a lien for $53,013.65, thereby seeking to recover a total of $100,909 in extras. The Owners, however, argue that Doornbos failed to prove the necessary elements to recover extras.

The issue of damages is a question of fact and, accordingly, a trial court's finding of damages will not be disturbed on appeal unless it is against the manifest weight of the evidence. Fieldcrest, 311 Ill. App. 3d at 607. A damage award is against the manifest weight of the evidence only where it is apparent that " 'the trial court ignored the evidence or that its measure of damages was erroneous as a matter of law.' " Fieldcrest, 311 Ill. App. 3d at 607, quoting Meade v. Kubinski, 277 Ill. App. 3d 1014, 1018 (1996). The party seeking damages must prove its damages to a reasonable degree of certainty, and accordingly the evidence it presents must not be remote, speculative, or uncertain. Carey v. American Family Brokerage, Inc., 391 Ill. App. 3d 273, 277-78 (2009). Absolute certainty with respect to the damage amount, however, is not required. Kirkpatrick v. Strosberg, 385 Ill. App. 3d 119, 130 (2008); see also Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd., 216 Ill. 2d 294, 307 (2005) (recognizing that damages are speculative only if their existence is uncertain, not if the amount itself is uncertain). Rather, the plaintiff need only present evidence that tends to show a basis with which to compute the damages with a fair degree of probability. La Salle National Trust, N.A. v. Board of Directors of the 1100 Lake Shore Drive Condominium, 287 Ill. App. 3d 449, 457 (1997).

When a contractor seeks "extras," it is his burden to prove, by clear and convincing evidence, that: (1) the extra work performed or materials furnished was outside the scope of the original contract; (2) the extras were furnished at the owner's request; (3) the owner, by words or conduct, agreed to compensate the contractor for the extra work; (4) the contractor did not undertake the extra work voluntarily; and (5) the extra work was not made necessary through the

25

fault of the contractor.  <u>Wilmette Partners v. Hamel</u>, 230 Ill. App. 3d 248, 264 (1992); <u>Athens v. Prousis</u>, 190 Ill. App. 3d 349, 356 (1989).

With respect to the first element, whether the extra work fell outside the scope of the contract, the parties agree that the extras for which Doornbos charged the Owners pertained to corrective work that Doornbos performed to comply with IDPH requirements and included alterations to fire dampers, ductwork and replacement of an exhaust fan.  The Owners contend, however, that this work fell within the scope of the contract, which provided for duct and fire damper work.  The Owners, however, ignore the provision in the parties' contract that provided: "Any additional work to meet *code requirements*, changes in building use or unforseen obstacles will be extra." (Emphasis added).  Accordingly, pursuant to the contract, the work Doornbos provided to meet IDPH requirements fell outside the contract and constituted extras.

We also find that Doornbos showed that the corrective work was not a voluntary act; rather, it was undertaken at Schlenker's request and he agreed to compensate Doornbos, thereby satisfying the second, third, and fourth elements.  The Owners observe that the record contains no signed change orders; however, we note that Schlenker, in a letter dated May 30, 2002, authorized Robert Doornbos to provide all of the work necessary to get the Project approved by the IDPH.  Although the letter does not detail the extra work Schlenker was authorizing Doornbos to provide, Doornbos submitted work tickets regarding the labor and materials it furnished that were signed by Don Changnon, Schlenker's general contractor.  Doornbos thus showed that the work it provided was requested and authorized by Schlenker personally as well as through his agent.

Turning to the final element, whether or not the extra work was made necessary through the fault of the contractor, the Owners argue that the corrective work was necessitated by Doornbos' own initial defective performance. We disagree. Al Kerelis testified that he assumed responsibility for the Project's design, including the HVAC system, and acknowledged that he provided direction as to the installation of the fire dampers. He further indicated that work commenced on the Project without the IDPH's approval of the Project's design at Schlenker's urging, which was an unusual practice. Robert Doornbos confirmed Kerelis' account and indicated that his company was instructed by Don Changnon to commence and continue work without IDPH approval because any alterations in the plan would be addressed on an as-needed basis. Doornbos thus established that the deficiencies in the work it provided, which necessitated subsequent corrective work, was the result of the direction it received from Kerelis and Changnon. Accordingly, we find that the record supports a finding that Doornbos, by clear and convincing evidence, established its claim for extras.

The Owners next dispute Doornbos' damage award by arguing that Doornbos failed to prove, by clear and convincing evidence, the amount of the damages to which it was entitled. Specifically, they contend that Doornbos failed to explain how it computed the balance it alleged it was owed for the HVAC services it provided on the Project. The Owners observe that Robert Doornbos could not explain which specific work comprised the $50,013.65 lien.

Here, there was extensive testimony presented at trial regarding damages and the sum which Doornbos sought to recover. At trial, Doornbos indicated that its lien claim contained a calculation error. Instead of the $53, 013.65 amount specified in its lien, it stipulated at trial, that

the correct sum was $50,013.65. In support of its lien claim, Doornbos produced invoices, handwritten notes, and testimony pertaining to the materials and labor it provided on the Project. Based on the invoices, handwritten notes, and testimony, the record reveals that Doornbos was seeking: $27,975.49, the amount due pursuant to an unpaid invoice dated February 11, 2002, $13,918 for work performed under the original contract; $13,638 for fire damper work; and $4,740 for a new exhaust fan for the surgery center, bringing the total to $56,271.49. After accounting for a $6,215 credit for redesigns and rebuilds that Doornbos provided the Owners, it appears that the actual lien amount to which Doornbos was entitled was $50,056.49, which is $42.84 more than the sum it stipulated to at trial and, thus, it was the Owners rather than Doornbos who benefitted from any potential calculation error. We are mindful, however, that damages need not be proven with mathematical certainty (Kirkpatrick, 385 Ill. App. 3d at 130) and that the plaintiff need only present evidence to allow the trial court to compute damages within a fair degree of probability (La Salle National Trust, 287 Ill. App. 3d at 457). Although the Owners are correct that Robert could not recall the specific work and each of the materials that comprised his company's lien claim, we observe that damages are only uncertain if their existence is uncertain, not if the amount is uncertain. Northern Illinois Emergency Physicians, 216 Ill. 2d at 307; Kirkpatrick, 385 Ill. App. 3d at 130. Ultimately, we find Doornbos provided, and the trial court considered, evidence with which to calculate Doornbos' damages to a reasonable degree of probability, and accordingly, we do not find that the damage award is against the manifest weight of the evidence.

The Owners next dispute the trial court's judgment in favor of Doornbos on its breach of

contract counterclaim, arguing that the trial court erred in interpreting the parties' contract. Specifically, they assert that pursuant to the plain language of the contract, Doornbos agreed to design and build the Project's HVAC system, and thus was liable for its design flaws. Moreover, the Owners argue that the trial court's judgment ignored the fact that Doornbos was contractually obligated, but failed to install, the HVAC system in a workmanlike manner and failed to comply with industry standards.

When an agreement between two parties is reduced to a written contract, that writing is presumed to reflect the intention of the parties. Paul B. Episcope, Ltd. v. Law Offices of Campbell & Di Vincenzo, 373 Ill. App. 3d 384, 391 (2007). In construing a contract, it is the court's primary objective is to ascertain and give effect to the intent of the parties that is expressed in the written agreement. Addison Insurance Co. v. Fay, 232 Ill. 2d 446, 455 (2009). If the written agreement is unambiguous, then the court must construe the parties' intent from the writing itself as a matter of law and effectuate its plain and ordinary meaning. Buenz v. Frontline Transportation Co., 227 Ill. 2d 302, 308 (2008); Episcope, 373 Ill. App. 3d at 391. A contract term or provision is considered ambiguous if, due to the indefiniteness of the language, it can be subject to multiple interpretations. Clarendon America Insurance Co. v. Aargus Security Systems, Inc., 374 Ill. App. 3d 591, 596 (2007); Episcope, 373 Ill. App. 3d at 389. In the event of a contractual ambiguity, the court may consider extrinsic evidence to resolve the uncertainties present in the written agreement. CFC Investment, L.L.C. v. McLean, 387 Ill. App. 3d 520, 527 (2008). The interpretation of a contract presents a question of law and is thus subject to *de novo* review. Gallagher v. Lenart, 367 Ill. App. 3d 293, 301 (2006). The court's finding as to whether

a breach of contract occurred, however, is a question of fact that will not be disturbed on appeal unless it against the manifest weight of the evidence. Covinsky v. Hannah Marine Corp., 388 Ill. App. 3d 478, 483 (2009).

Here, the Owners cite to the following language in the parties' May 15, 2000, contract to argue that Doornbos was contractually responsible for designing the HVAC system in conformance with applicable codes and was thereby liable for the its design flaws: "Doornbos will design the complete system." The Owners argue that this provision is unambiguous and that the trial court thus erred in considering extrinsic evidence and finding that Doornbos was not the party ultimately responsible for the HVAC design and was not in breach of the parties' agreement when the design did not comply with IDPH codes.

The Owners' argument, however, is premised on an incomplete citation to the relevant contractual language. In its entirety, the contract provides: "Doornbos will design the complete system, provide drawings, submittals and schedules *for approval*." (Emphasis added.) The contract, however, does not specify to whom Doornbos was to obtain approval of its design. Based on the indefiniteness of this provision, the trial court considered trial testimony to resolve the ambiguity, and we do not conclude that the trial court erred in doing so. Moreover, we do not find that the trial court erred in finding that Al Kerelis was ultimately responsible for designing an HVAC system that complied with relevant codes and that Doornbos was not in breach of the parties' contract.

At trial, Robert Doornbos testified that pursuant to his understanding with Schlenker and Kerelis, it was his contractual obligation to provide "concept drawings" of the Project's HVAC

30

system. He explained that these were simply preliminary designs that were subject to the approval of Kerelis and that it was Kerelis' responsibility, as the Project's architect, to ensure that the HVAC system that was ultimately installed, conformed to applicable codes. Kerelis confirmed Robert's account and interpretation of the contract's design provision. As the Project's architect, Kerelis testified that he was responsible for the complete design of the building, including the structural, electrical, plumbing, and mechanical aspects. He acknowledged that he received "shop drawings" from Robert Doornbos for the Project's HVAC system and ultimately provided sealed drawings of the entire Project, including the HVAC system, to the IDPH. Although the Owners attempt to minimize Kerelis's responsibility, his actions in sealing the drawings for submission to the IDPH were more than merely "ministerial." Rather, Kerelis made his own calculations and drawings of the HVAC mechanical system prior to sealing and submitting the plans for approval and admitted that, insofar as the HVAC system was concerned, the "buck stopped with [him]." Moreover, the Owners' expert, Brian Berg, testified that pursuant to standard practice in the construction industry, when a project is undertaken in the absence of a mechanical engineer, the architect who seals and submits building plans to state authorities assumes responsibility over design. Berg further acknowledged that an architect who assumes responsibility for a design is responsible for all defects and design flaws. Berg's characterization of this construction industry practice was confirmed by IDPH architect Lynn Manley. Although Schlenker testified at trial that, pursuant to his understanding of the parties' agreement, Doornbos was contractually responsible for designing an HVAC system that complied with state codes, the veracity of his testimony was undercut by the admission of a letter

31

Schlenker wrote to Doornbos in December 2001, in which he acknowledged that "none of us, with the exception of the architects[,] *** should be charged with interpreting codes." Ultimately, based on the evidence presented at trial, we do not conclude that the circuit court erred in finding that the Owners failed to prove that Doornbos was the party responsible for producing code-compliant HVAC designs and was in breach of their agreement.

The Owners, however, argue that the trial court nonetheless erred in finding in favor of Doornbos on its counterclaim, because even if Doornbos had not been contractually liable for providing a code-compliant HVAC design, it was still obligated to install the system in a workmanlike manner and comply with industry standards. The Owners observe that the contract stated: "All workmanship and materials [that Doornbos provides] will meet or exceed industry standards," and argue that the evidence showed that the labor and materials that Doornbos furnished were of poor quality and in violation of this contractual provision. Thus, the Owners argue that the trial court's finding that Doornbos was not in breach of the contract was against the manifest weight of the evidence.

Here, there is no dispute that installation problems related to the HVAC system arose during the course of the Project. As discussed previously, there were issues pertaining to the location and installation of fire dampers, the placement of ductwork, and inadequate air flow rates that initially precluded the Project's approval by the IDPH. Nonetheless, we reject the Owners' unsupported argument that the mere existence of these defects shows that Doornbos failed to provide HVAC services in a workmanlike manner, thereby breaching the parties' contract. It is clear that the work Doornbos provided was done in accordance with the plans

32

designed by Kerelis and under the direction of Don Changnon. Doornbos performed pursuant to its contract under the guidance of both Kerelis and Changnon. Indeed, much of the work Doornbos furnished was done before the design plan had been approved by the IDPH because it was ordered to do so by Changnon. It was the design itself that formed the basis for the problems that developed on the Project, and Kerelis undisputably assumed responsibility for the HVAC design, including the installation locations for HVAC material. Moreover, he opined that the work that Doornbos performed was done in a workmanlike manner and fell within industry standards. Indeed, while there were defects observed by the IDPH, Lynn Manley indicated that they were not unusual and were ultimately remedied. Based on the record, we do not conclude that the trial court's finding that Doornbos did not breach the parties' contract was against the manifest weight of the evidence.

Finally, the Owners contend that the trial court erred in granting Doornbos' pre-trial motion *in limine* barring the Owners from seeking delay damages pursuant to their breach of contract counterclaim. Because we conclude, however, that the trial court did not err in finding that the Owners failed to prevail on their breach of contract counterclaim and were thus not entitled to damages of any kind, we need not address this argument on appeal.

Accordingly, for the reasons stated herein, we affirm the judgment of the circuit court.

Affirmed.

HALL, P.J., and LAMPKIN, J., concur.