2017 IL App (1st) 153409

FOURTH DIVISION
March 31, 2017

No. 1-15-3409

| | | |
|---|---|---|
| ARCHON CONSTRUCTION COMPANY, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant and Counterdefendant- | ) | Cook County |
| Cross-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. SHELTER, L.L.C., U.S. SHELTER GROUP, INC., | ) | No. 08 CH 15325 |
| and OAK RIDGE OF ELGIN, L.L.C., | ) | |
| | ) | |
| Defendants-Appellees, | ) | |
| | ) | |
| (U.S. Shelter, L.L.C., and Oak Ridge of Elgin, L.L.C., | ) | |
| | ) | Honorable |
| Counterplaintiffs-Cross-Appellants). | ) | Lisa R. Curcio |
| | ) | Judge Presiding. |

PRESIDING JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices McBride and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    This appeal involves the trial court's decision on a *quantum meruit* claim made by plaintiff, Archon Construction Company, Inc. (Archon) against defendants, U.S. Shelter, L.L.C., U.S. Shelter Group, Inc., and Oak Ridge of Elgin, L.L.C. (collectively, U.S. Shelter). Archon appeals the trial court's decision denying its claim. U.S. Shelter cross-appeals the trial court's decision denying its counterclaim for breach of contract against Archon.

¶ 2    Archon was hired by U.S. Shelter to install a sanitary sewer system in a subdivision in the City of Elgin (city). The system would have to be approved and accepted by the city, which would ultimately own the system. The contract required Archon to conduct a videotaping of the interior of the completed system. After Archon completed the installation of the system, the

city's engineering inspector reviewed videotapes of the system and required additional work before the city would accept the system. Even though the proposal submitted by Archon, which was accepted by U.S. Shelter, had specified polyvinyl chloride (PVC) pipes, Archon had to excavate, remove, and replace a portion of the system's PVC pipes with ductile iron pipes. Archon submitted its bill for the extra work to U.S. Shelter, who refused to pay. Litigation ensued.

¶ 3    This is the second time this matter is before this court. On June 4, 2013, we reversed the circuit court's grant of summary judgment on Archon's "extra work" claim. See *Archon Construction Co. v. U.S. Shelter, L.L.C.*, 2013 IL App (1st) 121632-U. We concluded that general issues of material fact existed regarding, among other things, whether the "extra work" was made necessary through the fault of Archon.[1]

¶ 4    On remand, Archon voluntarily dismissed its "extra work" and other breach of contract claims, and proceeded to trial solely on its *quantum meruit* claim. After a bench trial, the court ruled in favor of defendants, concluding that Archon was not entitled to quasi-contractual relief for the costs it incurred for the services it performed. The court concluded that the services were covered under the express contract between Archon and U.S. Shelter and that Archon was the "contractor" responsible for the costs of the additional work. The court also found in favor of Archon on U.S. Shelter's breach of contract counterclaim for its repair and restoration of the surrounding property after Archon made its repairs to the sanitary sewer system. Both parties appealed.

---

[1]The dissent, however, concluded that summary judgment was proper because Archon failed to produce sufficient evidence to support every element of its *prima facie* case. *Id*. ¶ 26 (Connors, J., dissenting). Noting the elements that a plaintiff must prove—by clear and convincing evidence—in an "extra work" contract claim, the dissent concluded that Archon failed to produce any evidence regarding the fifth element, namely, that the "extra work" was not made necessary through the fault of Archon. *Id*. ¶ 28.

¶ 5    As we explain below, the contract required a sanitary sewer system that was subject to the final approval of the city. This matter actually involves a contractual dispute between the parties for the extra work and costs involved in obtaining that final approval. But, because an express contract existed between Archon and U.S. Shelter, Archon cannot recover under the quasi-contractual *quantum meruit* theory. We also conclude that the circuit court's decision finding in favor of Archon on U.S. Shelter's counterclaim was not against the manifest weight of the evidence. For the reasons that follow, we affirm the judgment of the circuit court of Cook County.

¶ 6                                    I. BACKGROUND

¶ 7    Archon is an underground utility contractor. U.S. Shelter is a home building company, primarily involved with residential developments. The land in each development is owned by a different limited liability company, of which defendant, Oak Ridge of Elgin, L.L.C., was one. The instant case involves the development of the residential subdivision in the city of Elgin, known as Oak Ridge of Elgin (subdivision).

¶ 8    U.S. Shelter hired Spies and Associates (Spies), a firm of civil engineers and land designers, to design plans for the subdivision and to be the on-site engineer, as required by the city and the Fox River Water Reclamation District (FRWRD). Spies prepared the plans, titled "Public Improvement Plans for Oak Ridge Subdivision" (Plans). The Plans were approved by the city, FRWRD, and the Illinois Environmental Protection Agency.[2]

¶ 9    The Plans included the "City of Elgin General Notes" (General Notes), a document provided by the city that includes the specifications the city requires for all sanitary sewer

_____

[2]Although U.S. Shelter filed a third-party complaint against Spies, that claim is not at issue on appeal. It appears from the trial court's order that the claim was "settled and dismissed before trial."

systems installed in the city. The General Notes state that all underground construction must comply with the "City of Elgin Engineering and Construction Standards and Specifications" (Elgin Specifications) and the "Standard Specifications for Water and Sewer Main Construction in Illinois" (Illinois Specifications).

¶ 10     U.S. Shelter sought bids for the installation of a sanitary sewer system for the subdivision and hired Archon after it submitted the successful bid. In addition to installing the sanitary sewer system, Archon agreed to install water main and storm sewers, for a total contract price of $890,955.29. The storm sewer and water systems are not at issue.

¶ 11     Archon's five-page proposal for the sanitary sewer system was based on the Plans. There is no dispute that the Plans, including the General Notes, the Elgin Specifications, and the Illinois Specifications, were incorporated into, and became a part of, the contract between Archon and U.S. Shelter.

¶ 12     The General Notes, in the section titled "Sanitary Sewer," state: "All sanitary sewers shall be televised and tested as required by [the city and FRWRD] prior to acceptance."

¶ 13     The Elgin Specifications state:

> "A mandatory televising of the sanitary sewer mains shall be performed by the developer one year after the successful completion of the sewer. The contractor shall then provide a copy of the video tape to the City of Elgin Engineering Division of Public Works for review. Any deficiencies or defects in the pipe material or construction, as noted by the engineer, shall be repaired at the contractor's expense prior to final acceptance by the city."

¶ 14     The Illinois Specifications state, among other things, that "[i]n the event the ENGINEER finds the materials or the finished product in which the materials are used or the WORK

performed are not in conformity with the Plans and Specifications including tolerances and have resulted in an inferior or unsatisfactory product, the WORK or material shall be removed and replaced or otherwise corrected by and at the expense of the CONTRACTOR."

¶ 15    Archon's proposal included a line item "Testing and Televise," with a price of $14,670.10. The proposal also contained itemized prices for materials, including types and quantities. The proposal further stated: "Any additional work items not listed will be completed on negotiated price or [time and materials]." Although the General Notes specified that the material of the sanitary sewer pipes could be either ductile iron or PVC (minimum SDR 26), Archon's proposal did not provide for installation of ductile iron pipe for any of the sanitary sewer lines. Archon's proposal provided that the sanitary sewer system would be constructed of PVC pipe, minimum SDR 26.[3]

¶ 16    Spies confirmed to U.S. Shelter that Archon's proposal complied with the Plans. Chuck Mensik, on behalf of U.S. Shelter, and Garry A. Sementa, on behalf of Archon, signed the final proposal dated January 6, 2005. Under its contract with U.S. Shelter, Spies was to oversee the installation of the sanitary sewer system.

¶ 17    Archon began installing the sanitary sewer system on February 23, 2005, and completed the installation around August 8, 2005. Prior to completing its installation of the sanitary sewer system, Archon had the pipes air tested and mandrel tested. FRWRD reviewed the air test and observed the mandrel test, and found both tests acceptable. Around the time Archon completed

---

[3]"SDR" stands for Standard Dimension Ratio. The ratio is the relationship between the pipe diameter and the wall thickness; a lower SDR indicates a greater wall thickness. Thus, SDR 26 PVC has a thicker pipe wall thickness than that of SDR 35 PVC.

the installation, Spies confirmed to U.S. Shelter that Archon's work complied with the Plans, the Elgin Specifications, and the Illinois Specifications.[4]

¶ 18    During construction, on three separate occasions, Archon had to excavate and repair various portions of the sanitary sewer system, including the portion between manhole (MH) 108 and MH 110. This extra work apparently resulted from Archon's use of fittings made of SDR 35 material, which was weaker and thinner than that required by the Plans, namely SDR 26 material. All of the repairs were completed by August 2005, and Archon did not request additional payments from U.S. Shelter for that extra work. The cost of that extra work is not at issue in this appeal.

¶ 19    As noted, the contract required televising of the sanitary sewer system before the city would accept the system. Archon had agreed to perform testing and televising of the sanitary sewer system in the contract. The city required that the televising be performed at least a year after installation to make sure that any potential settling had already occurred. In early 2007, Archon hired a company, H.R. Stewart to televise the sanitary sewer system. A camera was run through the system, and a videotape was made. The city's engineering inspector, William Becker, viewed the videotape. The city then conducted its own videotaping.[5]

¶ 20    On July 5, 2007, Becker, on behalf of the city, wrote to Mensik at U.S. Shelter, informing him that he had reviewed the videotapes and that repairs were needed before the city would accept the system. The letter stated that "[t]he major repair is the line from MH 108 to MH 110.

---

[4]Air testing pressurizes the installed line to check for any leaks in the system. A mandrel test involves inserting an undersized pipe into the installed pipe and pulling the undersized pipe through to check for any indentations in the installed pipe.

[5]At trial, Becker testified that he did not trust the initial video because it appeared that it was done while the line was being vacuumed out, which would have obscured any sags that might have been present in the pipes. Thus, Becker asked the city's own crews to go out and do a second videotaping.

Services are cracked, service lines have punched through, gravel is entering the system, dig up and replace. Again, replace with ductile iron the main, T's and service lines to a depth of 10'." This was the first time that "ductile iron" pipe was required.

¶ 21    Archon completed all of the repairs necessary as required for the city to accept the sanitary sewer system, including the replacement work between MH 108 and MH 110. Archon sent U.S. Shelter its bill totaling $247,432.41 for the time and materials for the extra work between MH 108 and MH 110 but did not seek payment for any of the other repairs. U.S. Shelter refused to pay Archon's bill. This lawsuit followed.

¶ 22    As we have earlier noted, the trial court granted summary judgment to defendants on Archon's "extra work" claim, which we reversed. *Archon Construction*, 2013 IL App (1st) 121632-U. After remand, Archon filed a third amended complaint. Count I was for breach of contract (for failure to pay the original contract price). Count II was for breach of contract (for failure to pay $287,432.41 for the extra work removing the PVC pipe and installing ductile iron pipe). Count III was for breach of contract (in the alternative). Count IV sought foreclosure of Archon's mechanic's lien. Count V sought *quantum meruit* relief, in the alternative. Archon later voluntarily dismissed all of the contractual claims, including the "extra work" claim, and went to trial solely on the *quantum meruit* claim. U.S. Shelter filed a second amended counterclaim against Archon for the costs incurred by U.S. Shelter in restoring and repairing the surrounding property after Archon's final excavation and repairs were made to the sanitary sewer system.

¶ 23    After a bench trial, the court ruled in favor of defendants on Archon's *quantum meruit* claim. The trial court found that, after the sanitary sewer system installed by Archon was not accepted by the city of Elgin, the repairs Archon made to the system were part of the parties' contract and, therefore, Archon could not recover under a theory of *quantum meruit*. The court

further found that the contract unambiguously provided that any work removing and replacing material was at the expense of the "contractor" and also that Archon was the "contractor." The court ruled in favor of Archon on U.S. Shelter's counterclaim. Both parties appealed.

¶ 24                                    II. ARCHON'S APPEAL

¶ 25                                 A. Standard of Review

¶ 26    We begin with Archon's claim that the court erred in ruling in favor of U.S. Shelter and against Archon on the *quantum meruit* claim. Generally, after a bench trial, our standard of review is whether the order or judgment is against the manifest weight of the evidence. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12. Under the manifest-weight standard, we give deference to the trial court as the finder of fact, because it is in the best position to observe the conduct and demeanor of the parties and witnesses. *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 27    But as to Archon's claims, the circuit court's decision did not involve any weighing of evidence or credibility determinations and was based solely on the trial court's construction of the parties' contract. In fact, the court concluded that the repairs were within the scope of the parties' contract and, therefore, Archon could not recover under a theory of *quantum meruit*. As a result of this conclusion, the court stated that it did "not address the evidence presented in support of Archon's *quantum meruit* claim." Thus, although the court referenced the testimony and other evidence at trial, the court's judgment as to Archon's *quantum meruit* claim was based on the court's construction of the parties' contract. The court found the contract to be unambiguous and, accordingly, made a ruling as a matter of law on its interpretation of the contract:

"There is no dispute that the proposal, the Plans including the General Notes, the Elgin Specification[s], and the Illinois Specifications are the contract between the parties, although not every document refers to the other. The Court, therefore, construes the documents as a whole. There is no claim that the documents are ambiguous, and the Court finds that they are not. Thus, the parties' intent is determined by construing the language of these documents in totality."

¶ 28     Because the trial court's ruling involved the interpretation of a contract it considered to be unambiguous, our review of the trial court's ruling is *de novo*. *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129 (2005) ("the construction, interpretation, or legal effect of a contract is a matter to be determined by the court as a question of law").

¶ 29                              B. *Quantum Meruit* in General

¶ 30     "The term *quantum meruit* means literally 'as much as he deserves' and is an expression that describes the extent of liability on a contract implied in law (also called a 'quasi-contract'); it is predicated on the reasonable value of the services performed." *Barry Mogul & Associates, Inc. v. Terrestris Development Co.*, 267 Ill. App. 3d 742, 749 (1994). "A quasi-contract, or contract implied in law, is one in which no actual agreement between the parties occurred, but a duty is imposed to prevent injustice." *Hayes Mechanical, Inc. v. First Industrial, L.P.*, 351 Ill. App. 3d 1, 8 (2004); see also *Century 21 Castles By King, Ltd. v. First National Bank of Western Springs*, 170 Ill. App. 3d 544, 548 (1988) (contract implied in law "arises from facts and circumstances independent of an agreement or consent of the parties").

¶ 31     To recover under a *quantum meruit* theory, a plaintiff must prove that (1) it performed a service to benefit the defendant, (2) it did not perform the service gratuitously, (3) defendant accepted the service, and (4) no contract existed to prescribe payment for the service. *Cove*

*Management v. AFLAC, Inc.*, 2013 IL App (1st) 120884, ¶ 34; *Installco, Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 781 (2002). It is the last element of a *quantum meruit* claim that controls the outcome here.

¶ 32    It is long settled in Illinois that an action in quasi-contract, such as *quantum meruit*, is precluded by the existence of an express contract between the parties regarding the work that was performed. *People v. Kinion*, 97 Ill. 2d 322, 332 (1983) (because express contract for compensation existed between client and attorney, *quantum meruit* relief was not available); *Karen Stavins Enterprises, Inc. v. Community College District No. 508*, 2015 IL App (1st) 150356, ¶ 7; *Stark Excavating, Inc. v. Carter Construction Services, Inc.*, 2012 IL App (4th) 110357, ¶ 38; *Gagnon v. Schickel*, 2012 IL App (1st) 120645, ¶ 29; *Hedlund & Hanley, LLC v. Board of Trustees of Community College District No. 508*, 376 Ill. App. 3d 200, 207 (2007); *Mid-West Energy Consultants, Inc. v. Covenant Home, Inc.*, 352 Ill. App. 3d 160, 166 (2004); *Installco, Inc.*, 336 Ill. App. 3d at 781; *Barry Mogul & Associates*, 267 Ill. App. 3d at 750.

¶ 33    Simply put, if an express contract exists between the parties concerning the same subject matter, a party cannot assert a claim on a contract implied in law. *Zadrozny v. City Colleges of Chicago*, 220 Ill. App. 3d 290, 295 (1991). The two cannot "coexist." *Id*. at 296. Long ago, the supreme court explained why:

> "As in physics, two solid bodies cannot occupy the same space at the same time, so in law and common sense, there cannot be an express and an implied contract for the same thing, existing at the same time. This is an axiomatic truth. It is only when parties do not expressly agree, that the law interposes and raises a promise." *Walker v. Brown*, 28 Ill. 378, 383 (1862).

¶ 34 Not quite as long ago—over a century later—this court added these thoughts supporting this legal principle:

> "When parties enter into a contract they assume certain risks with an expectation of a return. Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those expectations defeated. As a result, they have no remedy under the contract for restoring their expectations. In desperation, they turn to quasi-contract for recovery. This the law will not allow. Quasi-contract is not a means for shifting a risk one has assumed under contract." *Industrial Lift Truck Service Corp. v. Mitsubishi International Corp.*, 104 Ill. App. 3d 357, 361 (1982).

¶ 35                    C. Whether an Express Contract Governed This Work

¶ 36 So the critical question is whether an express contract existed for the work Archon performed, and for which it now seeks payment under the theory of *quantum meruit*. It is necessary, at the outset, to draw some boundaries around two different but closely-related legal theories, each of which has reared its head in this case.

¶ 37 The first is a claim for breach of contract, in which a contractor seeks compensation for "extra work" performed under the contract—a claim Archon initially made in this case, and the claim that was addressed by a different panel of this court the first time it was up on appeal. See *Archon Construction*, 2013 IL App (1st) 121632-U. A claim for "extras" involves many elements, but one of them is that the contractor must prove that the work for which the contractor

seeks compensation "was outside the scope of the original contract." *Doornbos Heating & Air Conditioning, Inc. v. James D. Schlenker, M.D., S.C.*, 403 Ill. App. 3d 468, 485 (2010).[6]

¶ 38     That makes sense, of course, because the whole point of an "extra work" claim is that the work was *not* included within the original terms of the contract, but the contractor can nevertheless establish its entitlement to payment. But compare that requirement for a contractual "extras" claim, that the work performed be "outside the scope of the original contract" (*id.*), with the element of a *quantum meruit* claim that there be no express contract between the parties. *Kinion*, 97 Ill. 2d at 332; *Karen Stavins Enterprises, Inc.*, 2015 IL App (1st) 150356, ¶ 7. Where do we draw the line between work being "outside the scope of a contract" versus there being no express contract governing the work? They would seem to cover a lot of the same territory, but as a matter of law, they cannot; as we have already noted, the case law has made it clear that a contractual claim and a *quantum meruit* claim are mutually exclusive—they cannot coexist.

¶ 39     The case law answers this question and provides a resolution to this portion of the appeal. As a discussion of two cases demonstrates, the answer is that a claim for *quantum meruit* lies when the work that the plaintiff performed was wholly beyond the subject matter of the contract that existed between the parties.

¶ 40     The first case is the one on which Archon principally relies, *Stark*, 2012 IL App (4th) 110357. *Stark* involved a warehouse expansion project in which a subcontractor, Stark, performed "concrete, excavation, trench backfill, and site utility work for the expansion project." *Id*. ¶ 5. In that action, Stark brought claims for breach of contract, *quantum meruit*, and unjust

---

[6]To state the elements in full, in an "extra work" contract claim, a plaintiff must prove "by clear and convincing evidence, that: (1) the extra work performed or materials furnished was outside the scope of the original contract; (2) the extras were furnished at the owner's request; (3) the owner, by words or conduct, agreed to compensate the contractor for the extra work; (4) the contractor did not undertake the extra work voluntarily; and (5) the extra work was not made necessary through the fault of the contractor." *Doornbos*, 403 Ill. App. 3d at 485.

enrichment against the general contractor for, among other things, nonpayment of extra work for "winter protection" at a worksite. *Id.* ¶ 1. Stark's written proposal for the work specifically *excluded* " 'winter protection of concrete or subgrade,' " which referred to "steps taken at the jobsite such as warming the subgrade, using heated enclosures or tents, and covering the concrete with insulation blankets or loose straw." *Id.* ¶ 5.

¶ 41 This court held that Stark's claim for *quantum meruit* could properly lie, and should not have been dismissed. Although the parties in *Stark* had an express contract, the court concluded that quasi-contractual recovery for the winter protection work was possible because "the payment for winter protection work was not included in the contract. In fact, it was expressly excluded." *Id.* ¶ 38. In other words, the claim for "winter protection" work did not involve the same subject matter as the contract, and thus, a *quantum meruit* claim could lie in the absence of such an express contract.

¶ 42 An important contrast to *Stark* is *Industrial Lift*, 104 Ill. App. 3d at 358, where the plaintiff and the defendant had a dealership agreement under which the plaintiff purchased the defendant's fork-lift trucks and used its best efforts to sell them to the plaintiff's customers. The plaintiff later made design changes to the trucks that it believed were necessary to sell the defendant's Japanese product to an American market. *Id.* at 359. After the defendant sent notice to the plaintiff that it was terminating the dealership agreement, the plaintiff sought quasi-contractual relief for the specific design services that the plaintiff had performed. *Id.*

¶ 43 But this court held that an action in quasi-contract did not lie, because even though the parties' contract "did not expressly cover" the design changes the plaintiff had performed, the work fell within the same "general subject matter" of the contract, namely "the sale and servicing of the defendant's products." *Id.* at 362. As this court explained: "If a quasi-contract action could

be brought every time a party under contract performs a service not precisely covered by the contract, then the rule preventing quasi-contract actions when a contract exists would have little meaning. Parties to a contract often perform services not expressly demanded by the contract." *Id*. at 361.

¶ 44    So in *Stark*, the plaintiff's claim for winter protection services was not part of the general subject matter of the parties' contract, and thus, the plaintiff could attempt to recover damages for that additional work under a *quantum meruit* theory. But in *Industrial Lift*, a quasi-contract theory would not lie, because the work plaintiff had performed was part of the same general subject matter as the parties' express contract, even if it went beyond the precise scope of that contract.

¶ 45    These cases clarify that, when evaluating a *quantum meruit* claim in a context such as this case, where a written contract exists between the parties, the operative question is not simply whether an express contract existed, or whether the challenged work was beyond the scope of the parties' contract. Rather, the operative question is whether an express contract governed the *same general subject matter* as the challenged work. If the work for which a plaintiff seeks remuneration under a *quantum meruit* theory concerned the same subject matter of the express contract, then the *quantum meruit* claim is barred as a matter of law. See also *City of Marshall v. City of Casey*, 177 Ill. App. 3d 1065, 1070 (1989) (affirming trial court's dismissal of action for equitable contribution where parties' relationship governed by written contracts; although parties' contracts did not "precisely govern" subject matter of contribution, agreement was express contract for contribution since it set forth methods by which parties would determine amount each owed to gas supplier and relative obligation of parties in underlying debt related to contribution); *Utility Audit, Inc. v. Horace Mann Service Corp*., 383 F.3d 683, 689 (7th Cir.

2004) ("In determining whether a claim falls outside a contract, the subject matter of the contract governs, not whether the contract contains terms or provisions related to the claim.").

¶ 46    With this is mind, the resolution of Archon's appeal is rather straightforward. The work that Archon performed, for which it now seeks money damages from U.S. Shelter, was part and parcel of the contract between the parties. Archon contracted to install a sanitary sewer system acceptable to the city. Its *quantum meruit* claim seeks to recover for repairing and reinstalling that very same sewer system. That work unquestionably involved the same "general subject matter" as the contract. *Id*.

¶ 47    Archon says that it had contracted to install PVC pipe, that the contract said nothing about installing ductile iron pipe, and thus the new work and materials (and associated, significantly higher costs) were beyond the scope of the contract. That may be so, but that does not change the fact that the subject matter of the contract between the parties was the installation of an acceptable sanitary sewer system; Archon's claims for its costs to repair and replace portions of that installed system, as required for the city's approval, concerned that same subject matter. Thus, Archon cannot avoid the effect of the general rule that the law will not imply a contract where an express contract already exists between the parties on the same subject matter.

¶ 48    We would also note that Archon's contract included a provision that "[a]ny additional work items not listed will be completed on negotiated price or [time and materials]." This only underscores that if Archon had a remedy at all in this case, it was a claim for "extra work" through the written contract, not a *quantum meruit* theory.

¶ 49    Indeed, it was under this additional work provision that Archon initially submitted its request for time and materials payment to U.S Shelter. And as we noted earlier, the first appeal in this case was litigated on Archon's claims for contractual "extra work." The trial court had

granted summary judgment on that claim, ruling that Archon had failed to demonstrate one particular element of its "extras" claim—that the extra work was not made necessary through the fault of the contractor. *Archon Construction*, 2013 IL App (1st) 121632-U, ¶ 18; see *Doornbos*, 403 Ill. App. 3d at 485 (noting that this element is part of claim for contractual "extras"). A majority of this court held that questions of material fact existed as to whether the problems with the sewer installation were Archon's fault and reversed the grant of summary judgment. *Archon Construction*, 2013 IL App (1st) 121632-U, ¶¶ 18-20. Justice Connors dissented, writing that Archon had presented no such proof, and the entry of summary judgment was proper. *Id* ¶¶ 28-30 (Connors, J., dissenting).

¶ 50     But Archon dropped its contractual "extras" claim upon remand, presumably seeing little chance of succeeding on the merits of that claim, and went to trial only on the *quantum meruit* claim.[7]

¶ 51     But whether Archon ultimately could have prevailed on that contractual claim or not, the fact remains that a contractual remedy was the only claim available to Archon as a matter of law. The existence of an express contract on the same subject matter dooms Archon's *quantum meruit* claim. The trial court's judgment in favor of U.S. Shelter and against Archon, on Archon's claim for *quantum meruit*, is affirmed.

---

[7]Archon probably had reason to be skeptical of its contractual "extras" count. The trial judge had clearly expressed skepticism about Archon's ability to prove its lack of fault for the defective piping, having entered summary judgment against Archon previously, as had Justice Connors, and the heightened standard of proof for "extras" cases (clear and convincing evidence; see *Doornbos*, 403 Ill. App. 3d at 485) probably played a role as well. And as we saw ultimately in the trial court's resolution of the case, the court was of the belief that nobody had proven, one way or the other, who or what was to blame for the ultimate defects, discovered in the 2007 videotape, that led to the removal of the PVC piping and the installation of the ductile iron piping in its place.

¶ 52                     III. U.S. SHELTER'S CROSS-APPEAL

¶ 53    We now turn to U.S. Shelter's cross-appeal. U.S. Shelter filed a second amended counterclaim against Archon for the costs incurred by U.S. Shelter in restoring and repairing the surrounding property after Archon's final excavation and repairs were made to the sanitary sewer system. The counterclaim contained a breach of contract count and a negligence count. At trial, U.S. Shelter sought $74,822.41 in claimed damages. The trial court ruled in favor of Archon on U.S. Shelter's second amended counterclaim. U.S. Shelter cross-appeal only as to the ruling on their contract counterclaim.[8]

¶ 54    We noted earlier that our standard of review after a bench trial is whether the order or judgment is against the manifest weight of the evidence. *Reliable Fire Equipment Co.*, 2011 IL 111871, ¶ 12. Under the manifest-weight standard, we give deference to the trial court as the finder of fact, because it is in the best position to observe the conduct and demeanor of the parties and witnesses. *Best*, 223 Ill. 2d at 350. Accordingly, "we will not substitute our judgment for that of the circuit court." *Staes & Scallan, P.C. v. Orlich*, 2012 IL App (1st) 112974, ¶ 35. A finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident or the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *Best*, 223 Ill. 2d at 350; see also *Walker v. Ridgeview Construction Co.*, 316 Ill. App. 3d 592, 595 (2000) ("A reviewing court will not reverse a trial court's decision merely because different conclusions can be drawn; an opposite conclusion must be clearly evident.").

¶ 55    To recover for breach of contract, a party must prove that "(a) a contract exists between plaintiff and defendant, (b) plaintiff performed her obligations under the contract, (c) defendant

---

[8]The trial court, noting that U.S. Shelter sought purely economic damages, concluded that U.S. Shelter could not recover on their negligence count pursuant to *Moorman Manufacturing Co. v. National Tank Co*., 91 Ill. 2d 69 (1982).

did not perform his obligations under the contract, and (d) damages resulted from the breach." *Walker*, 316 Ill. App. 3d at 595-96. The court explained that U.S. Shelter had "the burden to prove that (1) Archon did not perform its obligations under the contract and (2), Archon's failure to perform was the cause of [U.S. Shelter's claimed] damages."

¶ 56     As the trial court noted, U.S. Shelter alleged that Archon breached its contract by installing improper fittings, using the wrong couplings to repair connections, and failing to properly compact backfill used when digging up the area between MH 108 and MH 110 after performing the repairs in 2005. U.S. Shelter alleged that, when defects were later discovered in the 2007 videotape, requiring Archon to excavate again and replace the PVC pipe with ductile iron pipe, the excavation caused damage that required U.S. Shelter to repair the roadway; replace curbs, sidewalks, and aprons; and perform landscaping.

¶ 57     The court discussed, in impressive detail, the evidence presented at trial. As U.S. Shelter notes, the trial court found that "the evidence [had] shown that Archon did not comply with the terms of the contract when it used improper fittings and connected pipes with mission couplings." And the court further noted that, after this defective work was discovered in 2005, Archon made the repairs, and the system passed the required air and mandrel tests. But, as the trial court ultimately decided, U.S. Shelter failed to prove that the defects found during the 2007 videotaping were due to Archon's breach, as opposed to other possible reasons, and thus U.S. Shelter failed to prove that any breach by Archon was the cause of the damages U.S. Shelter suffered:

> "The evidence has not shown that the defects identified in the 2007 videotape
> were as a result of anything that Archon did or did not do. At least eighteen
> months elapsed between the time the sewer system passed the air and mandrel

tests and the videotaping. During that time, a great deal of construction occurred, including building roads and houses on the Project. As [the city] wanted, the videotaping did not occur until close to the end of the project so as to allow 'settling' to occur. No witness could testify that the defects identified in 2007 were because of Archon's use of incorrect fittings, repeated digging up of the area between manholes 108 and 110, or use of mission couplings. The evidence does not show that the work done in 2007 was due to the failure of Archon to perform some of its obligations under the contract. Consequently, U.S. Shelter cannot recover its costs of repairing the area after Archon completed its work."

¶ 58    We agree with Archon that U.S. Shelter has failed to cite to any portion of the record substantiating their claims that the trial court erred. The gist of U.S. Shelter's sparse argument regarding the counterclaim seems to be that, because Archon did not comply with the contract initially, anything that followed was attributable to Archon's initial breach. But the trial court properly required U.S. Shelter to prove that any damages they suffered as a result of the final excavation were caused by Archon's breach two years earlier. And the court clearly and persuasively found that U.S. Shelter did not establish that causal link, given the passage of time between the repairs initially performed and the defects discovered in 2007, the multitude of reasons that could explain the defects ultimately discovered in the system, and the fact that no witnesses could firmly place the blame for those problems on Archon. U.S. Shelter has given us no basis to upset the trial court's findings on the counterclaim, and we affirm that ruling as well.

¶ 59                                    IV. CONCLUSION

¶ 60    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County in all respects.

¶ 61    Affirmed.