2024 IL App (1st) 230516-U

FIRST DISTRICT,
FIRST DIVISION
May 28, 2024

No. 1-23-0516

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| PAT COHEN, | ) | |
| | ) | |
|       Plaintiff-Appellant, | ) | Appeal from the Circuit Court of Cook County, Illinois. |
| v. | ) | |
| | ) | |
| 175 EAST DELAWARE PLACE HOMEOWNERS ASSOCIATION, BOARD OF MANAGERS OF THE 175 EAST DELAWARE PLACE HOMEOWNERS ASSOCIATION, and BARRY BOWEN, | ) ) ) ) ) ) | No. 18 CH 01983<br><br>Honorable Allen P. Walker, Judge Presiding. |
| | ) | |
|       Defendants-Appellees. | ) | |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1     *Held*: (1) Condominium association's secret ballot procedures complied with the Condominium Property Act. (2) Condominium board breached fiduciary duty of candor by implementing policy regarding voting eligibility of unit owners who owned their units via land trust without notifying those owners of new procedures they were required to follow to have their votes counted. (3) Where a candidate for the board received sufficient votes to be seated but died on the day of the election, the board's decision to deem him elected and to leave his seat vacant was protected under the business judgment rule.

¶ 2      Plaintiff Pat Cohen brought an action against 175 East Delaware Place Homeowners Association (the Association), the Board of Managers of the Association (the Board), and Barry Bowen (President of the Board), alleging fraud in the 2017 and 2019 Board elections. In 2017, Cohen was not elected to the Board after a decisive vote in her favor was invalidated. In 2019, one of the 24 winning candidates was a deceased individual, with Cohen receiving the 25th-highest number of votes. The Association did not give Cohen the position and instead left it vacant.

¶ 3      Cohen brought the instant action seeking a declaratory judgment that the Association's secret ballot procedures were in violation of section 18(b)(10) of the Condominium Property Act (Act) (765 ILCS 605/18(b)(10) (West 2020)) and seeking damages for breach of fiduciary duty. Following a bench trial, judgment was entered in favor of defendants. For the reasons that follow, we affirm in part, reverse in part, and remand.

¶ 4                           BACKGROUND

¶ 5      The Association consists of 703 units in the John Hancock Tower in Chicago and is administered by a board of directors consisting of 48 unit owners. Board members serve two-year terms, staggered so that 24 Board members are elected every year.

¶ 6      In 2011, the Board adopted the following "Procedures for the Election of the Board of Directors" (Election Rules):

- The "Voting Member" for each unit is "the natural person most recently designated by the Unit Owner as such and registered with the Management Office on a signed and dated form called a 'Voting Member Form.' "

- Each year, the Association retains a certified public accounting (CPA) firm to function as Election Judges. Their duties include tabulating the ballots and "confirm[ing] the validity

of each Ballot by comparison with the Voting Member Form on file for that Voting Member."

- The Association also appoints an Election Committee comprised of non-Board members who supervise the tabulation of the ballots. If the Election Judges determine that a ballot "may be invalid," they refer it to the Election Committee, which is tasked with deciding "any issue referred to them by the Management or by the Election Judges pertaining to a Ballot, candidate eligibility, voter eligibility, voter intent, or any other matter relating to the conduct of the election." The Committee's decisions are "final and binding."

- Elections use a secret ballot voting system, whereby a portion of each ballot is removed after tabulation to conceal the identity of the owner who submitted the ballot. The remaining portion of the ballot reveals only the votes cast and the owner's voting percentage.

¶ 7    The Board has hired accountant Brad Kovach and his firm Picker & Associates to serve as Election Judges for "many years."

¶ 8                    The 2017 Election and the Disputed Bernstein Ballot

¶ 9    Cohen served on the Board from 2015 to 2017 and ran for re-election in 2017. On October 17, 2017, the evening of the election, Cohen delivered approximately 25 ballots to the room where the ballots were being tabulated, as was her usual practice. She gave the ballots to Kovach and then stayed to observe the tabulation process. Also present in the room were the members of the Election Committee and David Sugar, counsel for the Association. At one point, Cohen attempted to stand behind Kovach to see the screen of the laptop that he was using to tabulate the votes. Sugar told her to "move back and sit down" because she was "not permitted"

to "look at the ballots that [Kovach] is working on." Cohen testified that she moved back as directed and remained in the room for ten to fifteen minutes more before leaving.

¶ 10          One of the ballots delivered by Cohen was that of Gary Bernstein, who purchased Unit 8103 in 2007 and has resided there ever since. The record owner of the unit is a land trust of whom Bernstein is the sole beneficiary. In 2011, Bernstein signed and submitted a Voting Member Form listing himself as both the owner and the voting member for his unit.

¶ 11          Kovach testified that, when processing each ballot, he consults a spreadsheet of unit owners and voting members provided to him by the Association. If the signatory is not the owner of the unit, he will "double check" with Sugar "to verify that it's good" before counting the vote. For Unit 8103, the spreadsheet lists the "Verified Owner (HOA) (DEED)" as "BankFinancial, FSB, as Trustee u/ta dated May 16, 2007 and known as Trust No. 010929." The "Owner" of the unit is listed as Gary Bernstein, as is the "VM" (Voting Member).

¶ 12          Upon noticing that the signatory on the Bernstein ballot was not the same as the verified unit owner, Kovach brought the ballot to Sugar's attention. Sugar testified that he had "no idea" whom Bernstein had voted for and denied being instructed to "tank any particular candidate's victory." He consulted the Recorder of Deeds website and found "no hint" as to whether Bernstein was the beneficial owner of the unit. On examination by Cohen's counsel, Sugar conceded that the property deed provides that Bernstein is the person to whom tax bills are to be sent, and the Cook County Assessor's Office site states that Bernstein resides in the unit.

¶ 13          Sugar brought Bernstein's ballot to the Election Committee and told them, "The signature on the ballot is from a natural person. The owner on the list says it's a land trust. We have no information as to who the beneficial owner of the land trust is. *** [U]nder these circumstances, I don't think the vote can be counted." Pursuant to Sugar's suggestion, the Committee

invalidated the ballot. Neither Sugar nor the Committee attempted to contact Bernstein to clarify whether he was the beneficial owner of the trust.

¶ 14    The next day, the election results were released, with Cohen narrowly missing being seated on the Board. It is undisputed that she would have been seated if Bernstein's vote for her had not been invalidated.

¶ 15    At trial, Jennie Kobzarev, the Association's property manager, testified that it was her understanding that if a unit is owned by a land trust, the trustee (not the beneficial owner) has the sole power to delegate the voting rights for the unit. Similarly, Sugar testified that the Voting Member Form filled out by Bernstein "has the same problem as the ballot filled out by Gary Bernstein. Gary Bernstein is not the record owner of the unit, and we have nothing from the land trustee to tell us that he has authority to complete a ballot or complete a Voting Member Designation." His testimony was consistent with an October 18, 2016 email he sent to Kovach and Kobzarev stating: "There is no way to establish the identity of the true owner (the 'beneficial owner') of units owned by land trusts through public records. Without written confirmation of beneficial ownership from the land trustee, ballots and Voting Member Designations signed by the purported owner cannot be honored."

¶ 16    Kobzarev further testified that the Association sends out an annual Notice of Election packet that includes a Voting Member Form and reminds unit owners of the option to provide or update said form. The packet does not inform individuals who own their units through a trust of the procedure they must follow to be designated as voting members.

¶ 17                    The 2019 Election and the Death of Stefan Edlis

¶ 18    Cohen ran for the Board again in 2019. On the morning of the election, October 15, 2019, one of the other candidates named Stefan Edlis died. His wife informed Kobzarev of his death in

the early afternoon, and Kobzarev relayed the news to Sugar. According to Kobzarev, 85 to 90% of the votes had already been cast prior to election day.

¶ 19    The next day, October 16, Picker & Associates sent the Board an election results letter reflecting that Edlis placed in the top 24 candidates, while Cohen placed 25th. On Sugar's advice, the Board announced the tabulation of votes and left the 24th seat open pending a decision on how to handle the situation. Later that day, Cohen sent an email to Kobzarev and Bowen in which she argued that Edlis' death made him ineligible to be seated on the Board, and "[w]ithout Mr. Edlis being counted *** I received the 24th highest percentage of votes and therefore, should have been (should be) legally seated on the board of directors."

¶ 20    Subsequently, on November 14, 2019, Sugar provided the Board with a legal memorandum in which he discussed different ways that other jurisdictions have handled similar election disputes and recommended that Edlis be deemed elected but ineligible to serve since he was deceased, leaving a vacancy on the Board. At the next Board meeting, following discussion of Sugar's opinion, the Board decided that it would follow his recommendation and that it would leave Edlis' seat vacant. Bowen testified that "[b]ecause of the large size of our Board, we've never gone through the trouble and expense and administrative burden of conducting an election to fill one vacant seat or two or even three."

¶ 21    At trial, Kobzarev acknowledged that in 2013, Cohen made an objection to the eligibility of certain Board candidates. On September 18, 2013, Kobzarev sent Cohen the following reply:

> "If someone who is among the 24 highest vote-getters in the election is not legally eligible to serve on the Board, that person is not (and cannot be) elected to the Board, and the 25th highest vote-getter is elected to the Board. There is no vacancy to be filled by Board appointment, as the ineligible candidate was never lawfully elected in the first

place, so as to create a vacancy. *** [A]ny candidate who is not a unit owner on the day of the election cannot and will not be elected to the Board at the annual meeting."

¶ 22    Kobzarev testified that this letter was "cut and paste from advice [she] received from David Sugar." Asked whether a deceased individual was eligible to serve on the Board, Kobzarev stated that she does not determine eligibility of candidates but defers to Sugar's judgment. Sugar testified that the 2013 letter "was written for a different purpose in a different context and the focus is not how to resolve the situation that came up in 2019. It is really more to say how can we avoid this problem, how do we deal with it prior to the election in terms of vetting candidates."

¶ 23    Sugar further testified that he did not at any time substitute his judgment for that of the Board. He provided his analysis and a recommendation, after which the Board reached a decision. No one on the Board directed him to arrive at a decision that excluded Cohen from being seated. In researching the issue, Sugar found "very, very little in the way out there of authority." There was no relevant condominium law, and no law regarding elections where people vote over a period of weeks rather than on a single day. He explained the reasoning behind his recommendation as follows: "[T]here are people who voted in the 2019 election while Mr. Edlis was alive. They voted for him two weeks before he died and that's the candidate they wanted. If they wanted Pat Cohen, they would have voted for Pat Cohen." He acknowledged that, although unit owners may cast their votes early, they can change their votes on the night of the election.

¶ 24                                The Instant Action

¶ 25    In her operative complaint[1], filed on November 21, 2019, Cohen alleged that

_____

[1] Cohen filed her initial complaint on February 15, 2018 and amended her complaint after the events of the 2019 election.

¶ 26 the Association's secret ballot procedures violated section 18(b)(10) of the Act (765 ILCS 605/18(b)(10) (West 2020)), which provides, in relevant part, that a condo association

"may, upon adoption of the appropriate rules by the board of managers, conduct elections by secret ballot whereby the voting ballot is marked only with the percentage interest for the unit and the vote itself, provided that the board further adopt rules to verify the status of the unit owner issuing a proxy or casting a ballot; and further, that a candidate for election to the board of managers or such candidate's representative shall have the right to be present at the counting of ballots at such election."

¶ 27 Cohen alleged that "[a]s can be seen from the face of the [Association] Rules and from the results of the 2017 election, the Board has not adopted rules for verifying the status of unit owners to cast ballots" but instead employs "freewheeling discretion to arbitrarily decide which votes to count" in a manner that "fundamentally works to disenfranchise Plaintiff." Cohen further alleged that she was denied a "meaningful right to be present" during the counting of ballots because she was not permitted "a line-of-sight to view, inspect and make record of the ballots as they are being counted." She sought a declaratory judgment that the Board's secret ballot rule was "null and void" and an injunction against the use of secret ballots in Board elections "until the Association adopts and follows reasonable safeguards" regarding the validity of ballots and monitoring of the counting of ballots by candidates.

¶ 28 Cohen also sought damages for "Breach of Fiduciary Duty / Election Fraud" in regards to the 2017 and 2019 elections. She alleged that the Association and the Board willfully violated their fiduciary duties to her by disqualifying the Bernstein ballot in 2017, and by failing to

disqualify Edlis and seat Cohen as the eligible candidate who received the 24th highest number of votes in 2019.[2]

¶ 29        Following a four-day bench trial, the trial court entered judgment in favor of defendants on all counts. The court found that no violation of section 18(b)(10) occurred, since the Association "did in fact adopt and follow rules to verify the status of the unit owners" and allowed Cohen to be present during the vote tabulation. The Act does not "require that the candidate be allowed to inspect the votes or be close enough to read them."

¶ 30        As for Cohen's fiduciary duty claims, the court found that the Association did not owe her any fiduciary duty, but the Board had a fiduciary duty "to ensure strict compliance with the Act and its condominium instruments in conducting its elections." Regarding the 2017 election, the court found that the Board "adopted sufficient rules to verify the status of unit owners when using a secret ballot" and "were in strict compliance with the Act and condominium instruments." The court additionally found that Kovach and Sugar testified credibly as to the events on election night leading to the disqualification of Bernstein's vote. Regarding the 2019 election, the court found the Board's decision was protected under the business judgment rule because "[p]laintiff has not presented evidence showing bad faith on the part of the [B]oard for their reliance on their hired counsel in how to fill the vacancy left by Mr. Edlis' death."

¶ 31                                                              ANALYSIS

¶ 32        We review a judgment after a bench trial under the manifest weight of the evidence standard, giving deference to the trial court as the finder of fact, because it is in the best position to observe the conduct and demeanor of the parties and witnesses. *Archon Construction Co. v.*

---

[2] Cohen's complaint also included a count against Sugar for aiding and abetting a breach of fiduciary duty and a count for illegal electioneering against Board president Bowen. The trial court granted summary judgment to Sugar on the former count, and judgment to Bowen on the latter count, both of which are not contested on appeal.

*U.S. Shelter, L.L.C.*, 2017 IL App (1st) 153409, ¶ 26. However, "the construction of a statute is a question of law that is reviewed *de novo*." *State Place Condominium Ass'n v. Magpayo*, 2016 IL App (1st) 140426, ¶ 20.

¶ 33                    The Association's Secret Ballot Procedures

¶ 34        Cohen argues that the Association's secret ballot procedures failed to comply with section 18(b)(10) of the Act, which requires adoption of "appropriate rules *** to verify the status of the unit owner issuing a proxy or casting a ballot" and further provides that candidates have "the right to be present at the counting of ballots."

¶ 35        The record reflects that on April 25, 2011, the Board adopted Election Rules providing that "[t]he Voting Member for each unit shall be the natural person most recently designated by the Unit Owner as such and registered with the Management Office on a signed and dated form called a 'Voting Member Form.' " The Association requests a Voting Member Form from each new unit owner and annually reminds each owner of the option to provide or update their form. The information is compiled into a spreadsheet which is provided to the Election Judges to reference when tabulating the votes. Under these facts, the trial court did not err in finding that the Association adopted sufficient rules to verify the status of voters.

¶ 36        Cohen argues that the Election Rules are legally insufficient because they do not specify any special verification procedures for unit owners who own their units through a land trust. Kobzarev testified that the Association has a policy of requiring the land trustee to delegate the voting rights for the unit. This policy was originally set forth in an October 18, 2016 email by Sugar stating, "Without written confirmation of beneficial ownership from the land trustee, ballots and Voting Member Designations signed by the purported owner cannot be honored."

However, this policy is not in the Election Rules and not communicated to unit owners in the annual Notice of Election packet containing the Voting Member Form.

¶ 37    Cohen argues that this policy may not be enforced unless it is formally adopted by the Board at an open meeting. See 765 ILCS 605/18.4(h) (West 2020) (condominium board may "adopt and amend rules *** after a meeting of the unit owners called for the specific purpose of discussing the proposed rules"). More broadly, she argues that, in order for the Association to validly conduct elections by secret ballot, all policies related to verification of unit owners must be in writing and passed pursuant to section 18.4(h). We disagree. Section 18(b)(10) does not, on its face, require the rules to address every contingency regarding voter eligibility. Such a requirement would place an undue burden on condominium associations that is not supported by the plain text of the statute. See *USF Holland, Inc. v. Radogno, Cameli, & Hoag, P.C.*, 2014 IL App (1st) 131727, ¶ 58 (we interpret statutes according to their plain language and will not depart from that language by adding exceptions or conditions that conflict with the expressed intent of the legislature).

¶ 38    Cohen next argues that her right to be present at the counting of ballots was violated when she was "ordered to leave" the tabulation room. This is not supported by the record. After Cohen delivered the ballots, she attempted to stand behind Kovach to see his laptop screen, whereupon Sugar directed her to "move back and sit down" because she was "not permitted" to "look at the ballots." Cohen testified that she sat down approximately four feet away from Kovach and remained in the room for 10 to 15 more minutes until Kovach said that he was done tallying the ballots, at which point she thanked him and left. Kovach and Sugar both testified that Cohen voluntarily left before tallying was complete. Despite the differing versions of events, there was no testimony that Cohen was "ordered" to leave.

¶ 39        Alternatively, Cohen argues that she was not granted a "meaningful" right to be present because she was not permitted to view the screen of Kovach's laptop on which he was tallying the votes. We will not interpret a statute "in a manner that makes it meaningless." *Boucher v. 111 East Chestnut Condominium Ass'n*, 2018 IL App (1st) 162233, ¶ 18. If all candidates were allowed to see who voted for whom, the "secret" ballot procedure set forth in section 18(b)(10) would cease to be "secret." Here, Cohen was allowed to be present in close proximity to the Election Judge to confirm that the votes were being tabulated and not altered or destroyed. We find, as did the trial court, that this satisfies the requirements of section 18(b)(10).

¶ 40        Finally, Cohen contends that candidates have a right to be present "during all vote challenges and recounts" and, in particular, that she had a right to be present when the validity of the Bernstein vote was contested. She argues that, had she been present, she could have confirmed his ownership of the unit, since she was the realtor who sold it to him in 2007. Section 18(b)(10) does not, on its face, specify that candidates have a right to be present during vote challenges, and we will not read such a condition into the statute. *USF Holland, Inc.*, 2014 IL App (1st) 131727, ¶ 58. Accordingly, the trial court did not err in finding that the Association's secret ballot procedures were in compliance with section 18(b)(10) of the Act.

¶ 41                    Whether the Association Owes Cohen a Fiduciary Duty

¶ 42        Cohen argues that the trial court erred in finding that the Association, as an entity, did not owe her a fiduciary duty.

¶ 43        Section 18.4 of the Act (765 ILCS 605/18.4 (West 2018)) provides that "[i]n the performance of their duties, the officers and members of the board, *** shall exercise the care required of a fiduciary of the unit owners." This fiduciary duty is owed by boards as well as their individual members. *LaSalle National Trust v. Board of Directors of the 1100 Lake Shore Drive*

*Condominium*, 287 Ill. App. 3d 449, 454 (1997). Each board member owes fiduciary duties to unit owners "similar to the duties corporate directors owe to shareholders," including a duty to treat the unit owners "with the utmost candor, rectitude, care, loyalty, and good faith—in fact to treat [them] as well as [he] would treat himself." (Internal quotation marks omitted.) *Boucher*, 2018 IL App (1st) 162233, ¶¶ 35-36.

¶ 44        However, no provision in the Act imposes a fiduciary duty upon condominium associations. In asserting that the Association owes her a duty, plaintiff relies on *Boucher*, 2018 IL App (1st) 162233, ¶ 54, in which the court held that "where individual board members breach their fiduciary duties, any liability that may result due to the individual defendants' breach may extend to the association itself." See also *Wolinsky v. Kadison*, 114 Ill. App. 3d 527, 533 (1983) (breach of fiduciary duties by individual board members "will result in liability not only for the association but also for the individuals themselves"). *Boucher* and *Wolinsky* do not stand for the proposition that condominium associations have standalone fiduciary duties under the Act but, rather, "that when a unit owner can show that some association employee or board member has violated fiduciary duties, the unit owner may recover from the association." *Boucher*, 2018 IL App (1st) 162233, ¶ 54. Thus, any liability on the part of the Association would be contingent upon whether the Board violated its fiduciary duties toward Cohen, which we now turn to discuss.

¶ 45                                    2017 Election

¶ 46        Cohen contends that the Board breached its fiduciary duties by (1) invalidating Bernstein's vote and (2) failing to inform unit owners who own their units through a land trust of the procedures they need to follow to have their votes counted.

¶ 47          "[A] board's proper exercise of its fiduciary *** duty requires strict compliance with the condominium declaration and bylaws." *Wolinsky*, 114 Ill. App. 3d at 534. Cohen argues that invalidating Bernstein's vote violated the provision of the condominium declaration which provides that "[t]he total number of votes *** shall be one hundred (100), and each Owner, or group of Owners shall be entitled to the number of votes equal to the total of the percentage of ownership in the Common Elements applicable to his or their Unit Ownership." She argues that because owners "shall" be entitled to a certain percentage of votes, the Association is "not allowed" to invalidate votes "based solely on uncertainty as to whether the vote was legitimately cast." Contrary to Cohen's argument, the provision she cites does not purport to prohibit the Association from assessing the legitimacy of votes. The trial court did not err in finding that the Board strictly complied with the condominium declaration and bylaws.

¶ 48          Moreover, under the facts of this case, the decision to invalidate Bernstein's vote is protected by the business judgment rule, under which "[a]bsent evidence of bad faith, fraud, illegality, or gross overreaching, courts are not at liberty to interfere with the exercise of business judgment of corporate directors." (Internal quotation marks omitted.) *Duffy v. Orlan Brook Condominium Owners' Ass'n*, 2012 IL App (1st) 113577, ¶ 24. This rule "is intended to protect directors who have been diligent and careful in performing their duties from being exposed to liability from honest mistakes of judgment." *Id.* Thus, it only applies to board members who exercise due care in carrying out their duties. *Goldberg v. Astor Plaza Condominium Ass'n*, 2012 IL App (1st) 110620, ¶ 63. "One component of due care is that directors must inform themselves of material facts necessary for them to properly exercise their business judgment." *Id.* ¶ 64.

¶ 49          Here, Cohen did not present any evidence of bad faith, fraud, illegality, or gross overreaching in invalidating Bernstein's vote. The record reflects that Kovach observed that the

signatory on the Bernstein ballot was not the verified owner of the unit and referred the ballot to Sugar, as was his usual practice with such discrepancies. After searching public records, Sugar could not confirm whether Bernstein was the beneficial owner and recommended invalidating the vote. The Election Committee then decided to invalidate the vote. In keeping with the Election Rules, which provide that the Committee's decisions are "final and binding," the Board certified the election results. Under these facts, the Board properly exercised its business judgment and is insulated from "liability from honest mistakes of judgment" (*Duffy*, 2012 IL App (1st) 113577, ¶ 24).

¶ 50    Cohen argues that the Board failed to exercise due care because it did not "independently investigate whether [Bernstein's] vote should have counted." Even if the Board had conducted such an investigation, reversing the Committee's decision would have violated the Election Rules. Moreover, even if the Board had consulted Bernstein's Voting Member Form on file, it was filled out by Bernstein in his personal capacity and did not provide proof of his beneficial ownership of the unit. Accordingly, we do not find the Board's lack of an independent investigation to be a breach of fiduciary duty.

¶ 51    Cohen next argues that the Board breached its fiduciary duty of "utmost candor" (*Boucher*, 2018 IL App (1st) 162233, ¶ 56) to unit owners by failing to inform unit owners who owned their units through a land trust of the procedures they needed to follow to have their votes counted. Based upon Sugar's advice, starting with the 2017 election, the Board enforced a policy of requiring "the trustee for the trust [to] designate or indicate who has [the] voting rights for the unit." However, this policy was not communicated to unit owners prior to the 2017 election. On the contrary, Bernstein testified that on September 9, 2020, he received an email from Kobzarev informing him for the first time that since his unit was held in trust, he would only be eligible to

vote if the trustee notified the Association that he was the voting member for the unit. Prior to that email, he was not informed that his Voting Member Form was inadequate in any way.

¶ 52     "A court may hold fiduciaries liable for failure to disclose information to their principals." *Boucher*, 2018 IL App (1st) 162233, ¶ 36. Moreover, the record does not reflect that the Board relied on the advice of counsel or otherwise made a rational exercise of business judgment in failing to disclose its policy regarding units held in trust to Bernstein and other affected owners prior to the 2017 election. In other words, it is not that the Board discussed the matter and reached an honest judgment as to what information should be provided to unit owners in light of Sugar's 2016 email and the procedures developed therefrom; rather, the Board failed to make any judgment at all due to "inexcusable unawareness or inattention" (*Davis v. Dyson*, 387 Ill. App. 3d 676, 696 (2008) (internal quotation marks omitted)). Accordingly, we find that the Board's failure to disclose this information to unit owners was a violation of its fiduciary duties under the Act.

¶ 53                                2019 Election

¶ 54     Cohen argues that the Board violated its fiduciary duties by finding that Edlis was elected to the Board in 2019 and leaving his seat vacant rather than seating her.

¶ 55     The trial court found the Board's decision was protected under the business judgment rule because Cohen failed to present evidence showing bad faith on the part of the Board for their reliance on their hired counsel in how to proceed after Edlis' death. Cohen argues that the Board "could not have relied upon" Sugar's advice, because it decided to seat Edlis "weeks before" Sugar issued his November 14, 2019 memorandum recommending that Edlis be deemed elected. This misstates the record. On October 16, 2019, the day after the election, Picker & Associates sent the Board a letter with the results of the vote tabulation, reflecting that Edlis was

among the top 24 receivers of votes, while Cohen was 25th. The letter did not purport to decide any issues of candidate eligibility or state who should be seated on the Board. According to Bowen, the Board did not make any "final decisions" based upon this letter, but "announced the winners *** on a preliminary basis with the full knowledge that Mr. Edlis' situation was going to require further research." The Board did not make a decision until after Sugar had issued his memorandum and they had "full opportunity to question Mr. Sugar and satisfy themselves as to the *** proper way to proceed." Based on this testimony, the trial court properly found that the Board relied on Sugar's advice in exercising their business judgment.

¶ 56        Cohen argues this case is analogous to *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2014 IL App (1st) 111290, ¶¶ 116-17, in which we held that the business judgment rule did not protect a condominium board where the evidence was insufficient to show that the board acted upon advice of counsel in transferring surplus income to a reserve account. The board president testified that she thought the practice was based on advice of counsel but had "no idea" whether the purported advice was in writing or when it had been made. Cohen's reliance on *Palm* is unavailing, since Bowen's testimony regarding Sugar's written memorandum and the Board's reliance thereon was clear.

¶ 57        Cohen additionally argues that Sugar's recommendation to the Board was substantively incorrect, particularly in light of his contrary recommendation in 2013. As Sugar explained at trial, he was unable to find any authority precisely on point. As a result, he examined analogous authority in different jurisdictions to allow the Board to make an informed decision while acknowledging that either position was potentially subject to challenge. In light of the uncertainty in this area of law, the fact that Cohen would have reached a conclusion more

favorable to herself does not render the Board's contrary decision a breach of fiduciary duty. See *Duffy*, 2012 IL App (1st) 113577, ¶ 24.

¶ 58                                                    CONCLUSION

¶ 59        For the foregoing reasons, we reverse the judgment of the trial court for defendants insofar as we find that the Board breached its fiduciary duty of candor in the 2017 election by failing to inform unit owners who owned their units via land trust of the procedures they would need to follow to have their votes counted. We remand the cause to the trial court for further proceedings to determine the proper grant of relief on that issue. We affirm the judgment of the trial court in all other aspects.

¶ 60        Affirmed in part, reversed in part, and remanded.