2021 IL App (1st) 201156-U
Order filed: July 23, 2021

FIRST DISTRICT
FIFTH DIVISION

No. 1-20-1156

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| BAJA FOODS, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | 17 L 001228 |
| | ) | |
| SPARTAN SURFACES, INC., | ) | |
| NEWGRANGE, LLC, HPS | ) | |
| NORTH AMERICA, INC., | ) | |
| and FLOWCRETE NORTH | ) | |
| AMERICA, INC., | ) | Honorable |
| | ) | Diane M. Shelley, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Delort and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirmed the grant of summary judgment for defendant Spartan Surfaces on plaintiff's negligent misrepresentation and breach of implied warranty counts, finding that the negligent misrepresentation count was precluded under the *Moorman* doctrine and that the warranty count was precluded under section 2-607(3)(a) of the UCC. We also affirmed the court's award of damages for plaintiff on its breach of contract and breach of express warranty counts against the other defendant, Newgrange LLC.

¶ 2 Plaintiff, Baja Foods, LLC (Baja), brought a seven-count complaint against defendants Spartan Surfaces, Inc. (Spartan), Newgrange, LLC (Newgrange), HPS North America, Inc. (HPS), and Flowcrete North America, Inc. (Flowcrete), arising out of a failed floor renovation project at Baja's food production facility. Baja alleged: negligent misrepresentation, breach of the implied warranty of fitness, and breach of the warranty of merchantability in counts I-III against Spartan; breach of contract and breach of express warranty in counts IV-V against Newgrange; and breach of the warranty of merchantability in counts VI-VII against HPS and Flowcrete. The trial court granted summary judgment in favor of Spartan on counts I-III of Baja's complaint. Baja obtained a default judgment against Newgrange on counts IV and V and was awarded $857,608.33 after a prove-up of damages. Baja settled with HPS and Flowcrete and voluntarily dismissed counts VI and VII against them.

¶ 3 Baja appeals the trial court's grant of summary judgment in favor of Spartan on counts I-II, contending that questions of material fact exist precluding the grant of summary judgment. Baja also appeals the order awarding it $857,608.33 in damages against Newgrange, arguing that it should have been awarded additional damages for lost profits. We affirm the damages award against Newgrange and the grant of summary judgment for Spartan on count I for negligent misrepresentation and on count II for breach of the implied warranty of fitness.

¶ 4 In its complaint, Baja alleged that it is in the business of preparing and selling foods. In December 2015, Baja hired Newgrange to provide general contractor services with respect to the installation of new floors in several production rooms at Baja's food production facility. Newgrange retained Spartan to recommend and provide flooring materials to be used at the facility. According to its website, Spartan is "a sales and consulting group specializing in commercial flooring alternatives."

¶ 5    On or about May 16, 2015, a Spartan representative traveled to Baja's production facility to inspect and test the flooring in order to recommend a product appropriate for Baja's needs. At or near this time, Spartan requested information regarding the specific cleaning chemicals that Baja used on the floors at its facility. Baja sent an email to Spartan with the material safety data sheets detailing its floor cleaning chemicals.

¶ 6    Spartan recommended to Newgrange a urethane-based flooring product called "Flowfresh SR" provided by Flowcrete and a cement-based screed called "ZM Rapid" provided by HPS for use in the installation of the floors at Baja's food production facility. Newgrange purchased and installed the Flowcrete and HPS flooring materials recommended by Spartan. Shortly after installation, the floors began to delaminate and blister, making them unusable for Baja's food production business. As a result, Baja was forced to tear out the Flowcrete and HPS flooring systems, resurface the sub-layer, and reinstall new, suitable flooring products to replace the failed flooring. During this time, Baja suspended operations in the affected rooms for several months while the flooring was assessed and repaired, resulting in "a significant loss of sales and other business."

¶ 7    In count I, Baja alleged that Spartan negligently misrepresented that ZM Rapid and Flowfresh SR were suitable materials for use in Baja's production facilities.

¶ 8    In count II, Baja alleged that Spartan breached the implied warranty of fitness by recommending Flowcrete and HPS flooring materials that were unfit to be used for the flooring at Baja's food production facility.

¶ 9    In count III, Baja alleged that Spartan breached the implied warranty of merchantability by selling it flooring materials that were not fit for the ordinary purposes for which such products are used, namely, to provide a flooring surface free from blistering, delamination, and other defects.

¶ 10    In count IV, Baja alleged that Newgrange breached two written agreements to provide flooring renovation and general contractor services at its production facility.

¶ 11    In count V, Baja alleged that Newgrange breached its five-year warranty against concrete cracks and pooling and the two-year limited warranty on services performed.

¶ 12    Counts VI and VII alleged the breach of the warranty of merchantability against HPS and Flowcrete. Baja subsequently settled with HPS and Flowcrete and voluntarily dismissed these counts.

¶ 13    Spartan moved for summary judgment on counts I-III, arguing that Baja had released all claims against it. On February 15, 2018, the trial court granted Spartan's motion for summary judgment as to count III, the claim for breach of the implied warranty of merchantability. The court denied Spartan's summary judgment motion as to counts I and II.

¶ 14    During discovery, several depositions were taken. Art Velasquez, the CEO and managing partner of Baja, testified to contracting with Newgrange, a general contractor, to replace the flooring in three rooms in Baja's food production facility. Baja did not contract with Spartan. However, Newgrange worked with Spartan to provide the necessary flooring materials. On April 10, 2015, Spartan sent an employee, Todd Friedewald, to put in a "mock floor" on a small portion of one of the rooms in the facility "to test to see if it was what they wanted to do and [if] it would work." The mock-up floor performed well, there was no blistering or delamination.

¶ 15    Following the mock-up, Newgrange installed the remaining flooring in February 2016. In April 2016, Velasquez discovered that the floors were peeling and delaminating. Velasquez contacted Newgrange's owner, Sean Moran, to fix the floors, but his remediation efforts were unsuccessful. Velasquez terminated Newgrange on June 9, 2016. Velazquez removed the peeling

and delaminating flooring and had it destroyed in June or July 2016, and he hired a new flooring company, Flores Flooring, to install a new floor in late August or September 2016.

¶ 16    Sean Moran testified he was the former owner and project manager for Newgrange, a general contractor that does residential and commercial construction. Moran had offices in an office complex in Logan Square. Spartan had offices in the same complex.

¶ 17    Baja hired Newgrange to add on a new flooring system to its food production facility. Moran subsequently spoke with Mike Blasek, Spartan's managing partner, and asked that Spartan visit the Baja site and provide flooring recommendations. On April 10, 2015, Todd Friedewald, a Spartan employee, visited Baja to perform a "mock-up" in which he would test certain flooring products on a small portion (two feet by two feet) of one of the rooms. Friedewald used two HPS products, a primer called Schonox SHP Special Acrylic Primer and a self-leveling compound called ZM Rapid Setting and mixed it with two or three cementitious topping products made by Flowcrete. The mock-up resulted in the floor being too slippery, so a second mock-up was subsequently performed in which a sand-like product called an "aggregate" was added to the Schonox and Flowcrete products. The additional aggregate made the floor less slippery and therefore the second mock-up was considered a success. Newgrange made the decision to use the same combination of Schonox and Flowcrete products, mixed with the aggregate, when installing the new flooring system throughout Baja's food production facility. Newgrange purchased the Schonox products from Spartan and purchased the Flowcrete products directly from Flowcrete. Moran testified that Newgrange was acting as Baja's agent when purchasing those products.

¶ 18    In February 2016, Newgrange installed the new flooring system in multiple rooms within Baja's food production facility. Baja subsequently informed Moran of "problems" with the flooring. Moran went to the facility, walked the floors, and heard a hollow sound indicating that

the Schonox and Flowcrete products were not properly affixed to the floor. Moran opined that the Schonox primer may have been the problem because it "allowed moisture to permeate through it." Newgrange performed remedial work for five days but was unsuccessful in fixing the problem. Baja terminated Newgrange and hired a different flooring company to tear out the flooring and install new flooring.

¶ 19    Moran testified as follows regarding whether he ever informed Spartan (and specifically its managing partner Blasek) of the flooring problems:

"Q, At any time did you reach out to Mike Blasek in any way following the finding that there were issues with the flooring install?

*** 

A. I don't recall there being a specific conversation around it other than–Mike became aware. So I think it would have been likely in person at our offices. I had made them aware that there were some challenges that we're working through. And I would have made them aware that our *** contract was terminated.

Q. All right. The communication regarding your contract being terminated, how was that conveyed?

A. To Mike?

Q. Yeah.

A. I don't recall specifically. Mike and I saw each other almost every day. In fact, I do recall us having a lunch together and me explaining the situation.

Q. All right. Where was the lunch and when?

A. It would have been at our office sometime after the fact there—there was an issue."

¶ 20    Mike Blasek testified that Spartan is a flooring "middleman" which provides flooring materials to its customers. Spartan had offices in the same building as Newgrange. When Moran indicated that Newgrange was installing new flooring for Baja and inquired about flooring products, Blasek referred him to Friedewald, one of Spartan's salespersons. Blasek does not know which flooring products were selected for the Baja project.

¶ 21    Blasek testified as follows regarding his conversations with Moran about the flooring "issues" at the Baja food production facility:

"Q. Did you speak with Sean Moran after the floors failed about that the materials that he had applied to the Baja facility failed?

A. I believe we had interactions in a general like cafeteria-type area. There is only one place to eat, and he told me his company was in some trouble which we focused on that, and he said that there were some issues at the Baja site, but that's all, you know, he mentioned. ***

Q. So when did that conversation take place?

A. I don't know.

* * *

Q. Did [Moran] tell you that the materials that Spartan Surfaces supplied for the Baja job failed?

A. I don't recall.

Q. You don't recall one way or the other whether he told you that or not?

A. No. I vaguely recall him saying there are some issues at a job called Baja."

¶ 22    Spartan moved again for summary judgment after fact discovery on the two remaining counts against it, count I for negligent misrepresentation and count II for breach of the implied warranty of fitness. On March 12, 2020, the court granted Spartan's motion for summary

judgment, finding that count I was precluded under the *Moorman* doctrine and that count II was precluded because Baja had failed to give Spartan reasonable notice of its warranty claim under section 2-607(3)(a) of the Unified Commercial Code (UCC) (810 ILCS 5/2-607(3)(a)(West 2016)).

¶ 23    Baja filed a motion for reconsideration of the court's grant of summary judgment for Spartan on its negligent misrepresentation and breach of the implied warranty of fitness counts. With respect to the court's finding that Baja had failed to reasonably notify Spartan of the flooring failure and concomitant warranty claim, Baja filed an affidavit from Moran providing new details regarding the timing and content of the notification that he provided to Blasek. Moran attested in pertinent part that after the "flooring failure" at Baja, he met with Blasek at a restaurant in May 2016. During that meeting, Moran told Blasek "that there were issues with the Baja job," that "the floors were delaminating" and that "the entire flooring system had failed." The court denied Baja's motion for reconsideration.

¶ 24    Meanwhile, Baja obtained a default judgment against Newgrange and the court held a prove-up hearing. Velasquez's testimony at the hearing established that in September 2016, Baja was scheduled to introduce a new product, buffalo chicken empanadas, as a limited time offer (LTO) on the menu at Buffalo Wild Wings' (BWW's) 1,200 locations nationwide. Since BWW is a sports bar chain, it divides its annual LTO calendar into zones to correspond with major sports seasons and events. Baja's empanadas were slated to be introduced in what BWW refers to as Zone 5 of their annual calendar. Zone 5 occurs during football season, commencing at the beginning of September and running for about eight weeks through October.

¶ 25    Baja was going to produce 5.2 million empanadas during the Zone 5 release with a profit margin of 13.5 cents per empanada. Due to the flooring failure, though, Baja was unable to produce

the empanadas for the Zone 5 release, resulting in a loss of profits of $703,647 during September-October 2016. Baja also incurred over $100,000 in expenses for repairing the damaged flooring.

¶ 26 Velasquez further testified that had he been able to get the empanadas on the BWW menu in time for the Zone 5 release, he expected they would have been so successful and popular that BWW would have agreed to his selling them even after the completion of the Zone 5 release, from November 2016 through the date of the hearing in September 2020. Velasquez's expectation of being allowed to keep the empanadas on the BWW menu from November 2016 to September 2020 was based on conversations he had with BWW's executive director and executive chef, who both assured him that his empanadas would remain on the menu after the completion of the Zone 5 release. With a 13.5 cent profit margin per empanada, Baja would have made over $11 million in profits during that time-frame. However, due to the floor failure and Baja's concomitant inability to provide the empanadas during the Zone 5 release, he lost the opportunity to place the empanadas on the BWW menu from November 2016 through September 2020.

¶ 27 Velasquez admitted he did not have a written contract for the placement of the empanadas on the BWW menu from November 2016 through September 2020. Also, both the executive chef and executive director who had assured him of their desire to place the empanadas on the BWW menu left the company in 2017.

¶ 28 The trial court entered an order on September 30, 2020, finding that Baja had proved its damages and lost profits for September through October 2016 and awarding it $857,608.33. However, the court found that in the absence of a written contract and with the departures of the executive chef and executive director, Baja's lost profits from November 2016 through September 2020 were speculative. Accordingly, the court denied Baja's claim for any lost profits during that time-frame.

¶ 29 Baja filed a notice of appeal from the January 27 order granting summary judgment for Spartan on counts I and II of Baja's complaint for, respectively, negligent misrepresentation, and breach of the implied warranty of fitness. Baja also appealed the September 30, 2020, order awarding it some, but not all, of its requested damages as against Newgrange. Baja did not file a notice of appeal from the February 15, 2018, order granting summary judgment for Spartan on count II for breach of the implied warranty of merchantability and therefore that order is not before us.

¶ 30 We proceed to address the court's grant of summary judgment for Spartan on count I of Baja's complaint for negligent misrepresentation. Summary judgment is appropriate when the pleadings, depositions, admissions, and affidavits on file show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Walker v. Chasteen*, 2021 IL 126086, ¶ 13. Our review is *de novo*. *Id.*

¶ 31 The trial court's grant of summary judgment was based on the economic loss doctrine (also known as the *Moorman* doctrine) as set forth in *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69 (1982). In *Moorman*, the supreme court held that when a defect in a product is qualitative in nature and relates to the consumer's expectation that the product is of a particular quality, resulting in economic loss but no personal injury or property damage, the consumer's remedy lies in contract, not in tort. *Id.* at 88. The *Moorman* doctrine bars tort recovery for purely economic losses even when plaintiff has no remedy in contract. *Fox Associates, Inc. v. Robert Half International, Inc.*, 334 Ill. App. 3d 90, 93 (2002).

¶ 32 An exception to the *Moorman* doctrine exists ("the information exception"), which allows for the recovery of economic loss in tort "where one who is in the business of supplying

information for the guidance of others in their business transactions makes negligent misrepresentations." *Moorman*, 91 Ill. 2d at 88-89.

¶ 33    The trial court here found that the *Moorman* doctrine bars Baja's recovery under the negligent misrepresentation count because the cause of action is a tort and the damages related to that count are purely economic and the information exception did not apply. Baja concedes that count I of its complaint for the tort of negligent misrepresentation sought recovery for economic loss but contends on appeal that Spartan was in the business of supplying information for the guidance of others in their business transactions and therefore that the court should have denied Spartan summary judgment under the information exception to the *Moorman* doctrine. We disagree. This exception does not apply when the information supplied is merely ancillary to the sale of a product or service or in connection with the sale. *Fox Associates*, 334 Ill. App. 3d at 94. The test for whether the information exception applies is whether the end product of the relationship between the parties is a tangible object which could be readily described in a contract or whether it is intangible. *Fireman's Fund Insurance Co. v. SEC Donahue, Inc.*, 176 Ill. 2d 160, 168-69 (1997). If the intended end result of the relationship between the parties is the creation of a product, a tangible thing, then the information exception does not apply and economic loss is not recoverable in tort. However, where the ultimate result of the relationship is intangible, such as when an attorney prepares a legal brief or an accountant produces a financial statement, the information exception applies to allow recovery of economic loss in tort because the value of the services lies in the ideas behind the documents, not in the documents themselves. *Id.*; *MW Manufacturers, Inc. v. Friedman Corp.*, 1998 WL 417501 (N.D. Ill.).

¶ 34    In the present case, the end product of the relationship between Spartan, Newgrange, and Baja was a tangible object, the flooring in Baja's food production facility. Specifically, Newgrange

was hired by Baja to install the new flooring. Newgrange then contacted Spartan, who sent Friedewald out to Baja's facility to perform a mock-up so as to assess which flooring products were appropriate to the project. Based on the mock-up, Spartan recommended that Newgrange use a combination of a Schonox primer and self-leveling compound (which Spartan had available for sale) and Flowcrete cement topping products (available for sale from the Flowcrete manufacturer) when installing the flooring. Newgrange took Spartan's advice, purchased the Schonox and Flowcrete products on Baja's behalf, and used them during the floor installation. Thus, all the information provided by Spartan related to the sale of the Schonox and Flowcrete products needed for Baja's flooring project and ultimately resulted in the new floors installed in multiple rooms in Baja's food production facility. As the information provided by Spartan was ancillary to the sale of the Schonox and Flowcrete flooring materials and resulted in a tangible product for Baja, the trial court correctly found that the information exception to the *Moorman* doctrine was inapplicable, such that Baja was precluded from recovering economic losses as a result of Spartan's alleged negligent misrepresentation. We affirm the grant of summary judgment for Spartan on count I of Baja's complaint.

¶ 35    Next, we address the trial court's grant of summary judgment for Spartan on count II of Baja's complaint for breach of the implied warranty of fitness based on the alleged unfitness of the flooring products recommended by Spartan and purchased and utilized by Newgrange on Baja's behalf. Summary judgment was granted because the court found that Baja violated section 2-607(3)(a) of the UCC which imposes a duty on every buyer who has accepted goods to give notice of an alleged breach of an implied warranty to his seller within a reasonable time after he discovers, or should have discovered, the breach. 810 ILCS 5/2-607(3)(a)(West 2016). The failure to give such notice bars the buyer from any remedy. *Id.* The purpose of the notice requirement is

to provide the seller the opportunity to cure a defect and minimize damages, protect his ability to investigate a breach and gather evidence, and to encourage negotiation and settlement. *Maldonado v. Creative Woodworking Concepts, Inc.*, 296 Ill. App. 3d 935, 939 (1998). The buyer need not give direct notice to the seller when the seller otherwise has actual notice of the defect in the product. *Id.* at 940.

¶ 36    The trial court found that Baja violated the notice requirement by failing to notify Spartan of the alleged breach of the implied warranty until November 11, 2016, when it sent a demand letter to Spartan. The demand letter/notification was sent to Spartan about four months after Baja removed and destroyed the defective flooring including the flooring products that had been recommended by Spartan, thereby preventing Spartan from taking any efforts to cure the defect and minimize damages and thus defeating one of the purposes of the notice requirement.

¶ 37    Baja argued, though, that regardless of any deficiencies in its direct notice to Spartan, no violation of section 2-607(3)(a) of the UCC occurred because Newgrange's owner, Moran, provided Spartan's managing partner Blasek with actual notice of the alleged breach of implied warranty before the defective flooring was removed and destroyed. The trial court rejected Baja's argument because Moran only testified in his deposition that he recalled informing Blasek of undefined "flooring issues" at an indeterminate date but could not remember their "specific conversation" and Blasek similarly testified to only "vaguely" recalling that on an indeterminate date, Moran informed him of undefined "issues at the Baja site." The court found that Moran's and Blasek's deposition testimony was so vague and ambiguous regarding the timing and content of the alleged notice as to amount to speculation or conjecture regarding whether Moran had actually notified Blasek, prior to the destruction of the flooring in June or July 2016, of the problems Baja incurred with the flooring products. We agree and affirm the grant of summary

judgment for Spartan on count II as "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999).

¶ 38    Baja argues, though, that its claim for breach of the implied warranty of fitness should have survived summary judgment because Spartan could not have cured the defect and minimized damages even had it been timely notified of the defective flooring prior to its removal and replacement. Baja points to the deposition testimony of Phil Milord, a general contractor who inspected Baja's food production facility shortly after the flooring failure and who opined that Baja's *only* recourse was to remove the defective flooring and put down new floors.

¶ 39    Baja's argument fails because section 2-607(3)(a) does not contain an exception to the notice requirement; notice within a reasonable time of the discovery of the breach must be given, otherwise the buyer is "barred from any remedy." 810 ILCS 5/2-607(3)(a)(West 2016). Further, had Baja given Spartan reasonably timely notice, Spartan would have had the opportunity to inspect the facility before the floors were disposed of and replaced and perhaps it would have come to a conclusion different than Milord's regarding how to ameliorate the flooring issues without replacing the entire floor. Of course, such an outcome is speculative precisely because Baja failed to give the requisite notice. Baja's failure to comply with section 2-607(3)(a)'s notice requirement necessitates summary judgment in favor of Spartan.

¶ 40    Baja next argues that the trial court should have granted its motion to reconsider the grant of summary judgment for Spartan on the breach of implied warranty of fitness count based on the attached affidavit from Moran that provided new details regarding his conversation with Blasek about the "problems" that Baja was having with its floors. In his affidavit, Moran attested that in "approximately May 2016" he met Blasek at a restaurant and told him that "the floors were

delaminating and that the entire flooring system had failed." Baja contends that Moran's affidavit clearly shows that Spartan received actual notice of the defective flooring prior to that flooring being ripped out and replaced which was sufficient to comply with section 2-607(3)(a).

¶ 41 The purpose of a motion to reconsider is to bring to the trial court's attention newly discovered evidence not available at the time of the original hearing, changes in the law, or errors in the court's previous application of existing law. *Stringer v. Packaging Corp. of America*, 351 Ill. App. 3d 1135, 1140 (2004). Generally, the decision to grant or deny a motion to reconsider lies within the trial court's discretion and will not be reversed absent an abuse thereof. *Id.* However, where a motion to reconsider an order granting summary judgment raises the question of whether the trial court erred in its previous application of existing law, our review is *de novo*. *Duresa v. Commonwealth Edison Co.*, 348 Ill. App. 3d 90, 97 (2004). Spartan argues for an abuse of discretion standard of review, whereas Baja contends that the *de novo* standard applies here. We need not resolve this issue, as our holding would be the same under either standard.

¶ 42 Baja's motion to reconsider sought to present a new affidavit from Moran containing testimony regarding the content and timing of his notice to Blasek about the defective flooring/breach of warranty which contradicted his deposition testimony in which he could not recall the timing or details of such notice. No explanation was given for the change in testimony or why it was not available at the original hearing. The trial court was not required to consider Moran's new affidavit that was not disclosed until after Baja lost the summary judgment motion. We have held:

> "Trial courts should not permit litigants to stand mute, lose a motion, and then frantically gather evidentiary material to show that the court erred in its ruling. Civil proceedings already suffer from far too many delays, and the interests of finality and efficiency *require*

that the trial courts not consider such late-tendered evidentiary material, no matter what the contents thereof may be." (Emphasis in original.) *Gardner v. Navistar International Transportation Corp.*, 213 Ill. App. 3d 242, 248-49 (1991).

¶ 43 The trial court here committed no error, under either the abuse of discretion or *de novo* standard of review, in denying Baja's motion to reconsider the grant of summary judgment based on Moran's late-disclosed affidavit.

¶ 44 Baja argues, though, that "when new or unexpected issues arise late in the summary judgment process that can be easily cured by affidavit, the Court should reconsider a draconian award of summary judgment." Baja cites in support Justice Cook's specially concurring opinion in *Stringer*, in which he wrote:

"Not every motion to reconsider is an abuse of the legal process. For example, sometimes the opponent at the motion hearing raises issues that no one thought were disputed, issues easily refuted by an additional affidavit. The practice of law is not a matter of precision; even the best lawyers know more about their case as it progresses than they did when it began." *Stringer*, 351 Ill. App. 3d at 1142-43 (Cook, J., specially concurring).

¶ 45 In the present case, the parties' summary judgment pleadings and their arguments at the hearing on the motion clearly indicated an awareness of the issue of whether Baja provided Spartan with the requisite notice under section 2-607(3)(a) of the UCC. As this issue was *not* a new or unexpected one arising late in the summary judgment process, the exception articulated by Justice Cook, allowing for the filing of an additional affidavit to counter an unexpected issue raised for the first time at the hearing, is inapplicable here.

¶ 46 Next, Baja argues that the trial court erred in the amount of damages it awarded following the default judgment entered against Newgrange. The issue of damages is a question of fact and

therefore the trial court's finding of damages will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Doornbos Heating and Air Conditioning, Inc. v. James D. Schlenker, M.D., S.C.*, 403 Ill. App. 3d 468, 485 (2010). The party seeking damages must prove its damages to a reasonable degree of certainty, and the evidence it presents must not be remote, speculative, or uncertain. *Id.*

¶ 47 As discussed earlier in this order, the trial court held a prove-up hearing at which Velazquez testified that in the absence of the flooring failure, Baja would have introduced a new product, buffalo chicken empanadas, as a limited time offer on the BWW menu from September to October 2016. The trial court awarded Baja $857,608.33 for the expenses in repairing the defective flooring as well as the profits it lost due to its inability (as a result of the flooring failure) to introduce the empanadas on to the BWW menu for September to October 2016. Baja contends that the trial court erred by failing to award it an additional $11 million in lost profits from November 2016 through September 2020 based on Velazquez's belief that had Baja gotten the empanadas onto the BWW menu in time for the limited time release, it then would have been allowed to keep the empanadas on the menu and to make over $11 million in sales from November 2016 through September 2020. The trial court denied Baja's claim for $11 million in lost profits from November 2016 through September 2020, finding that such a claim was speculative because Baja had no written contract for the placement of the empanadas on the BWW menu during that time-frame, and because the executive chef and executive director who had assured him of their desire to place the empanadas on the BWW menu left the company in 2017. The court's finding was not against the manifest weight of the evidence. See *Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.*, 143 Ill. App. 3d 168, 174 (1986) (lost profits are not a proper element of damages where proof of those profits is based on conjecture or speculation).

¶ 48    For all the foregoing reasons, we affirm the circuit court.

¶ 49    Affirmed.